IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HONEYWELL INTERNATIONAL, INC., and
HONEYWELL INTELLECTUAL
PROPERTIES, INC.,

        Plaintiffs,

        v.

AUDIOVOX COMMUNICATIONS CORP.,
AUDIOVOX ELECTRONICS CORP., NIKON
CORPORATION, NIKON INC., NOKIA
CORPORATION, NOKIA INC., SANYO
ELECTRIC CO., LTD., and SANYO NORTH
AMERICA,

        Defendants.

_____

C.A. No. 04-1337 (KAJ)

**APPENDIX TO
<u>SEIKO EPSON CORPORATION'S MOTION TO INTERVENE</u>**

## TABLE OF CONTENTS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | *HBB Ltd. Partnership v. Ford Motor Co.,* 1992 WL 348870 (N.D. Ill. 1992) |
| B | *International Business Machines Corp. v. Conner Peripherals, Inc.,* 1994 WL 706208 (N.D. Cal. 1994) |
| C | *Lemelson v. Larami Corp.,* 1981 WL 319072 (S.D.N.Y. 1981) |
| D | *Proxim Inc. v. 3Com Corp.,* 2003 WL 403348 (D. Del. 2003) |
| E | *Rates Technology, Inc. v. New York Telephone Co.,* 1995 WL 438954 (S.D.N.Y. 1995) |
| F | *Technology Licensing Corp. v. Gennum Corp.,* 2004 WL 1274391 (N.D. Cal. 2004) |

**EXHIBIT A**

\\\LA - 81747/0239 - 232220 v1

United States District Court, N.D. Illinois, Eastern Division.
HBB LIMITED PARTNERSHIP, an Illinois Limited Partnership, and HBB Management
Corp., an Illinois Corporation, Plaintiffs,

v.

FORD MOTOR COMPANY, a Corporation, Chrysler Corporation, a Corporation, General
Motors Corporation, a Corporation, Mazda Motor of America Inc., a Corporation,
Mazda (North America) Inc., a Corporation, Mazda Motor Manufacturing Inc., a
Corporation, American Honda Motor Co., Inc., a Corporation, Honda of America
Manufacturing, a Corporation, Mitsubishi Motor Sales of America, Inc., a
Corporation, Nissan North America, a Corporation, Nissan Motor Manufacturing
Corp. U.S.A., a Corporation, Toyota Motor Sales U.S.A., a Corporation, Toyota
Motor Manufacturing USA Inc., a Corporation, Mercedes-Benz of North America
Inc., a Corporation, BMW of North American Inc., a Corporation, Volvo North
America Corp., a Corporation, Defendants.
**No. 92-C-3287.**

Nov. 10, 1992.

MEMORANDUM OPINION AND ORDER

<u>NORDBERG</u>, District Judge.

**\*1** Before the Court are motions by eight companies seeking to intervene in this patent
infringement action:  Morton International, Inc., TRW Inc., TRW Vehicle Safety Systems, Inc.,
Talley Automotive Products, Inc., Talley Defense systems, Inc., Bayern Chemie Airbag GmbH,
Daicel Chemical Industries, Inc., and Nippon Koki Co. (the "Intervenors").   For the reasons
discussed below, the Intervenors' motions are granted.

 HBB Limited Partnership and HBB Management Corp. (together "HBB") have brought this
action against sixteen car companies (the "Car Companies") alleging that the Car Companies
have infringed upon three patents relating to air bag inflators and subassemblies.   The devices in
issue are designed, manufactured, and supplied to the Car Companies by the Intervenors.   The
Intervenors have indemnity agreements with the Car Companies and have essentially taken over
control of their defense in this case.   The Intervenors claim that they are the true parties in
interest in this case.     They have submitted proposed answers, affirmative defenses, and
counterclaims that they would file if permitted to intervene.     The parties agree that these
memoranda are virtually identical to those submitted by the Car Companies.

 The Intervenors seek to intervene permissibly, not as of right.     Therefore, the Intervenors'
motions are governed by <u>Rule 24(b)(2) of the Federal Rules of Civil Procedure</u> which provides, in
relevant part, as follows:
  (b) Permissive Intervention.   Upon timely application anyone may be permitted to intervene in
  an action:  ... (2) when an applicant's claim or defense and the main action have a question of
  law or fact in common....   In exercising its discretion the court shall consider whether the
  intervention will unduly delay or prejudice the adjudication of the rights of the original parties.
 Thus, an applicant seeking to intervene must demonstrate three requirements:  (1) that the
application was timely, (2) that there exists a common question of law or fact, and (3) that there
will be no undue delay of the rights of the original parties.   Once these requirements are satisfied,

\\\LA - 81747/0239 - 232220 v1

the Court has discretion over whether or not to permit intervention.  *See* Charles A. Wright, Arthur R. Miller, and Mary K. Kane, Federal Practice and Procedure § 1913 (1986).

 The timeliness of this application is not in dispute.  As to the second requirement, the parties agree that the questions to be raised are identical to those currently existing in the case:  patent invalidity and noninfringement. Despite its agreement over the identity of the issues to be raised, HBB raises the interesting argument that the Intervenors' questions are too identical to the ones being litigated.  In support of this proposition, HBB cites five cases:  *Oregon Environmental Council v. Oregon Department of Environmental Quality,* 775 F.Supp. 353 (D.Or.1991); *Brock v. McGee Bros.,* 111 F.R.D. 484 (W.D.N.C.1986); *Hoots v. Pennsylvania,* 672 F.2d 1133 (3d Cir.1982); *California v. Tahoe Regional Planning Agency,* 792 F.2d 775 (9th Cir.1986); and, *Harrisburg Hospital v. Thornburgh,* 611 F.Supp. 900 (M.D.Pa.1985).  None of these cases apply here.

 **\*2** In each of the cases cited by HBB, the court refused to permit permissive intervention by a third party whose interests would be affected by the outcome of the original litigation.  The third party essentially joined the litigation to assist the party with whom it shared an interest.  In none of those cases, as here, was the third party subject to discovery.  In none of those cases, as here, was the third party already involved in the litigation, bound by an indemnification agreement, subject to becoming a third party defendant, or likely to be bound by the judgment. [FN1]  In each of those cases, the party seeking to intervene was merely superfluous.  Such is not the case here.  The Intervenors will be subject to extensive discovery in this case and maintain an essential role in the litigation.   Permitting the intervention by a manufacturer in a patent infringement case against its customers is well supported by case law.  *See Lemelson v. Larami Corp.,* 32 Fed.R.Serv.2d (Callaghan) 1133, 1134 (S.D.N.Y.1981) (permitting intervention by manufacturer/vendor in suit against its customer where the two intended to defend on the basis of patent invalidity and the manufacturer was obligated by prior agreement to indemnify the customer); *Stewart-Warner Corp. v. Westinghouse Elec. Corp.,* 325 F.2d 822, 826 (2d Cir.1963), cert. denied, 376 U.S. 944 (1964) (holding that a subsidiary manufacturer and vendor of disputed patented equipment properly was permitted to intervene in a suit against its parent); *Salem Eng'g Co. v. National Supply Co.,* 75 F.Supp. 993, 999-1000 (W.D.Pa.1948) ("Public Policy favors the rule that litigation for the purpose of ascertaining and sustaining alleged rights of a patentee or manufacturer should be brought against the alleged wrongful manufacturer rather than against the customer of the manufacturer.").  In the Court's opinion, the Intervenors have satisfied the second requirement of Rule 24(b)(2).

 The third requirement of Rule 24(b)(2) is also in dispute.   HBB claims that by permitting the Intervenors to join this case would delay the adjudication of their rights.  Permissive intervention may be denied when intervention would delay or prejudice the adjudication of the rights of the original parties.  *See* Wright, Miller & Kane, *supra,* § 1913 at 378-84. Given that this litigation is in its early stages, undue delays seems unlikely.  Although HBB may incur additional costs in litigating against more parties, the presence of the Intervenors may actually expedite this litigation, especially since the Intervenors possess and control many important documents. Plaintiffs claim that the requested intervention, coupled with a potential stay as requested by defendants, would delay their right to proceed against the Car Companies.   Regardless of this Court's ruling on the motion to stay, plaintiffs have a right to prompt adjudication of their rights in the patents at issue.  Plaintiffs have not sufficiently demonstrated how those rights would be differently affected by proceeding only against the Car Companies.   Given that HBB is not

seeking an injunction, such would be a difficult task.

 **\*3** Accordingly, the motions of Intervenors for leave to intervene are hereby granted and they are hereby made party defendants to this case. Intervenors shall have ten days from the date of entry of this Order to answer or to otherwise plead to the Plaintiffs' Complaint.

> <u>FN1.</u> Of course the third party in each case may have been subject to the doctrine of stare decisis but it would have had the opportunity to fully litigate the same issues again and thereby challenge the reasoning and applicability of the prior judgment.  Here, the Intervenors would likely be bound by the doctrine of collateral estoppel and would therefore have little opportunity to challenge or distinguish the reasoning of a prior judgment.  *See* <u>Stevenson v. Sears Roebuck & Co., 713 F.2d 705 (Fed. Cir.1983)</u>.

 1992 WL 348870 (N.D.Ill.)

END OF DOCUMENT

**EXHIBIT B**

\\\LA - 81747/0239 - 232220 v1

United States District Court, N.D. California.
INTERNATIONAL BUSINESS MACHINES, CORPORATION, a New York corporation,
Plaintiff,
v.
CONNER PERIPHERALS, INC., a Delaware corporation, Defendant.
And Related Counterclaims.
ADAPTEC, INC., Intervenor-Plaintiff,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation,
Intervention-Defendant.
**Nos. C-93-20117 RPA/EAI, C-93-20829 RPA/EAI, C-93-20591 RPA/EAI.**

Dec. 13, 1994.

Patrick Lynch, Robert E. Willett, Mark A. Samuels, O'Melveny & Myers, Los Angeles, CA.

David J. Cushing, Sughrue, Mion, Zinn, Macpeak & Seas, Washington, DC.

E. Ronald Coffman, Charlotte, NC.

Anthony L. Clapes, c/o International Business Machines Corp., White Plains, NY.

Michael A. Ladra, Michael Barclay, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA.

Paul H. Heller, Philip J. McCabe, Walter E. Hanley, Jr., Kenyon & Kenyon, One Broadway, New York City.

Martin C. Fliesler, Mark E. Miller, Fliesler, Dubb, Meyer & Lovejoy, San Francisco, CA.

Susan Wolfe, c/o Conner Peripherals, Inc., San Jose, CA.

James H.A. Pooley, Jodi L. Sutton, Fish & Richardson, Menlo Park, CA.

Ronald E. Myrick, Fish & Richardson, Boston, MA.

*ORDER GRANTING ADAPTEC, INC.'S MOTION TO INTERVENE IN CASE NOS. C-93-20117, C-93-20829, C-93-20591*

AGUILAR, District Judge.

### INTRODUCTION

**\*1** Adaptec, Inc. has moved this court for an order permitting it to intervene in the *IBM v. Conner* lawsuit, Civil Action No. C-93-20591 RPA (EAI), and in the *Western Digital v. Conner* lawsuits, Civil Action Nos. C-93-20117 RPA (EAI) and C-93-20829 RPA (EAI).  Adaptec is seeking a declaratory judgment that:  (1) any obligations of Adaptec with respect to claims asserted against Conner in these actions are governed by the June 14, 1990 purchase agreement between Conner and Adaptec;  (2) Adaptec, under the purchase agreement, is not obligated to protect or hold Conner harmless from infringement claims directed at Conner's combinations of

Adaptec's controllers with other disk-drive components; and, even if it did, (3) Conner has waived (or is estopped to assert) any such obligation by its failure to comply with the requirement of the purchase agreement. The agreement required Conner promptly to notify Adaptec of IBM and Western Digital's patent infringement claims and authorize Adaptec to settle or defend them.

After having reviewed and considered all papers submitted by the parties and heard oral argument on the issues on December 9, 1994, the court took the matter under submission. For the following reasons, the court grants Adaptec, Inc.'s motion to intervene.

*FACTS*

In November 1990, IBM put Conner on notice of IBM's patent infringement claims against Conner. At that time, Adaptec was selling disk drive controllers to Conner pursuant to a Volume Purchase Agreement ("VPA"). Under the VPA, Adaptec agreed to protect and hold Conner harmless from claims resulting from any alleged infringement of patents by products purchased by Conner from Adaptec. This obligation, however, did not extend to infringement resulting from Conner's combination of Adaptec's controllers with other products.

However, as a condition precedent to Adaptec's obligation, the VPA requires Conner to (1) promptly notify Adaptec of all such claims made against Conner and (2) authorize Adaptec to settle or defend any such claim. [FN1]

Conner, in fact never told Adaptec about the November 1990 letter from IBM. Conner delayed giving any notice of the IBM claim to Adaptec until after IBM filed a lawsuit against Conner. At that time Conner advised Adaptec of that particular suit. Apparently, Conner did not authorize Adaptec to settle or defend the IBM claims. Adaptec claims that they could have settled this case with IBM if they had been timely notified of the claims of IBM.

In November 1990, when IBM notified Conner of its claims, Adaptec had an on-going business relationship with IBM and was licensed to use many of the patents IBM asserted against Conner. Adaptec claims that settlement would have been possible during that time period. Adaptec alleges that any possibility of conducting meaningful settlement negotiations passed prior to their becoming aware of the IBM claims.

In addition, Adaptec alleges that because Conner delayed in notifying them of the potential infringement of IBM's products, Adaptec was unable to design around IBM's asserted patents. In 1990, Adaptec was developing the technology upon which three of Adaptec's controllers implicated by Conner's drives are based. Adaptec may have been able to avert litigation by designing new products and redesigning existing products.

*2 IBM and Conner unsuccessfully negotiated settlement of IBM's claims from 1990 to 1993. Adaptec was unaware of these discussions and was therefore excluded from these negotiations. On August 11, 1993, IBM sued Conner, asserting some of the same claims previously asserted in its November 7, 1990 notice letter to Conner. IBM accused Conner's hard disk drives--including those that incorporate Adaptec's disk drive controllers--of infringing nine (now eleven) IBM disk-drive-related patents. IBM did not directly accuse Adaptec's products (i.e. controllers) of infringement. Rather, IBM contended that Conner's use of Adaptec disk controller ICs with other Conner components in those drives, resulted in Conner's direct infringement of IBM's patents. IBM claims that it was the combination of components that caused the infringement.

9

At the time Conner advised Adaptec of IBM's claims, Conner proposed that Adaptec and Conner enter into a standstill agreement.   Adaptec considered this agreement and tried simultaneously to obtain information about the underlying facts constituting IBM's claims.   Not knowing how old IBM's claims were, Adaptec said it would waive Conner's failure to give prompt notice of IBM's lawsuit, i.e. waive the two-month delay, before Conner provided the complaint to Adaptec. Adaptec alleges that it never entered into any kind of "standstill agreement."

Adaptec alleges that it made several attempts to obtain information regarding the IBM claims from Conner without success.   After Adaptec learned of the November 27, 1995 trial date, Adaptec advised Conner that Adaptec needed more information.   On September 1, 1994, Conner wrote Adaptec informing them that it intended to tender the defense of the IBM and Western Digital claims to Adaptec in accordance with the VPA.   Specifically, Conner identified five IBM patent disputes, the defense of which, it intended to tender to Adaptec. Despite this intent, Conner apparently never actually authorized Adaptec to settle or defend the claims.

After Adaptec received Conner's September 1, 1994 letter, that it learned of the IBM's earlier November 1990 notice letter from IBM.

On March 8, 1993, plaintiff Western Digital filed an infringement action against Conner alleging that Conner's products using Adaptec controllers infringed Western Digital's products.   Western Digital accused Conner's disk drives of infringing two Western Digital patents.   Conner did not notify Adaptec of these until July 7, 1994.   At that time, however, Conner merely sent a copy of Western Digital's Second Amended Complaint, along with the newly asserted patent, to Adaptec for review and comment.

Trial in these consolidated actions has been set for November 27, 1995.   Fact discovery cut-off is for June 30, 1995.   Expert discovery cut-off is August 25, 1995.

*DISCUSSION*

Adaptec is moving to intervene in the above identified actions as either a matter of right pursuant to Fed.R.Civ.P. 24(a)(2) or permissively pursuant to Fed.R.Civ.P. 24(b)(2).

**\*3** Prior to reaching a discussion of the particulars of whether intervention is appropriate in this instance, this court must find that it has jurisdiction over the intervenor's potential claim.   IBM argues that there is no diversity jurisdiction under 28 U.S.C. § 1332 nor any supplemental subject matter jurisdiction under 28 U.S.C. § 1367.   Adaptec, in its reply brief concedes that the diversity allegation was not well founded and removed that allegation from its proposed complaint which is attached to the reply brief as exhibit A.

Adaptec argues, however, that the court has supplemental jurisdiction over the Conner/Adaptec indemnity dispute pursuant to 28 U.S.C. § 1367(a).   This is because Conner's potential indemnity claim against Adaptec derives from IBM's infringement claims against Conner. Adaptec is seeking a declaration that it has no obligation to defend or hold Conner harmless from IBM's infringement claims through its proposed complaint in intervention.

This court does have supplemental jurisdiction over the state law contract claims Adaptec has asserted against Conner.   The Ninth Circuit has held that ancillary (now known as supplemental)

jurisdiction exists when defendant has sought to join a third-party who may be liable for a portion of defendant's liability to the plaintiff. The claim must be on the theory that the third-party's claims necessarily arose out of the same set of operative facts. *Burke v. Ernest W. Hahn, Inc.,* 592 F.2d 542, 546 (9th Cir.1979).

This court finds that it has jurisdiction over Adaptec's claims. The next step in the analysis is to determine whether or not Adaptec can meet the specific test for intervention by right or the test for permissive intervention.

1. *Intervention as a matter of right.*

Fed.R.Civ.P. 24(a)(2) states:
   (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

The courts have culled from this code section a four part test for deciding an applicant's motion to intervene as of right: "(1) applicants's motion must be timely; (2) applicant must assert an interest relating to property or transaction which is subject of action; (3) applicant must be so situated that without intervention disposition of action may, as a practical matter impair or impede ability to protect that interest; and (4) applicant's interest must be inadequately represented by other parties." *Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d. 525, 527, (citations omitted).

a. *Timeliness*

**\*4** Three factors are considered in determining timeliness: (1) the stage of the proceedings; (2) the reason for and length of the delay; and, (3) the prejudice to the other parties. *United States v. Oregon,* 745 F.2d 550, 552 (9th Cir.1984). The courts have held that the time component should be measured "... from the point which an applicant knows, or should know, its rights are directly affected by the litigation, not ... from the time the applicant learns of the litigation." *United States v. Alcan Aluminum,* 25 F.3d 1173, 1182 (3rd Cir.1994). IBM argues that since Adaptec learned of the IMB's patent claims against Conner as early as October 1993--more than a year before it brought this motion--the motion is, therefore, untimely.

The court finds, however, that since Conner only recently articulated its intent to seek indemnity from Adaptec, Adaptec did not unreasonably delay before bringing this motion. The court further finds that there is no undue prejudice to IBM by allowing Adaptec to intervene herein.

IBM has inquired as to whether or not this court is capable of hearing Adaptec's additional claims on its civil trial calendar during this upcoming year. The court has reviewed its docket and trial calendar, and concludes that it will be able to handle the additional claims without unnecessary delay to the parties or to the court. IBM claims that Adaptec was bringing this motion as part of an arrangement with Conner to delay the lawsuit. The court finds no evidence to indicate that Adaptec is seeking to intervene merely in an effort to delay this action.

11

b. *Interest*

Prongs two through four of the test for intervention relate to the issue of whether or not Adaptec can show an "interest" in the main litigation. Over and above showing the existence of an interest, the intervenor must show: (1) Adaptec must be able to show that it can represent its interest in a practical manner by intervening; (2) none of the existing parties are presently representing the interest of Adaptec.

As IBM claims in its papers, Adaptec seeks to intervene as a plaintiff to sue its customer Conner on the contractual indemnity and thereby avoid its customer's tender of defense. IBM then cites an insurance case *Travelers Indem. Co. v. Dingwell,* 884 F.2d 629 (1st Cir.1989) for the proposition that an insurer cannot intervene seeking declaratory relief in the underlying tort action. In *Travelers, supra,* the insurance company, who was potentially liable as the insurer of the defendant in the underlying tort action, sought to intervene its declaratory relief action into the main tort action. Travelers sought a determination that the tort defendant did not actually have insurance coverage with the insurance company. IBM attempts to extend the reasoning in the *Travelers* case to the case at bar to show that Adaptec should not be able to intervene.

The court, however, finds that *Travelers, supra,* is not relevant to the case at bar. Adaptec's claims are directly related to the IBM/Conner and Western Digital/Conner cases. Adaptec's interest arises out of the same operative facts as does the underlying action.

**\*5** Conner's alleged indemnity claim against Adaptec stem from IBM's infringement claims against the Conner disk drives that incorporate Adaptec's disk drive controllers. IBM's claims, in effect, are claims against Adaptec. IBM has accused Adaptec's controllers of infringement.

Conner's alleged indemnity claim against Adaptec is based on IBM's infringement claims. Therefore, unlike the insurer in *Travelers,* Adaptec's declaratory relief claims " 'bear a sufficiently close relationship' to the dispute between the original litigation [IBM vs. Conner]." *See Travelers,* 884 F.2d at 638, 640.

To the extent Adaptec's products are implicated by IBM's infringement claims, Adaptec has a direct interest in the subject matter of the action. Adaptec played an important role in manufacturing and designing the controllers that allegedly infringed IBM and Western Digital's products. Therefore, Adaptec's involvement is closely related to the main infringement case before the court. Adaptec, as the designer of the subject controllers should be able to present facts relevant to whether the controllers actually did infringe the IBM and Western Digital products before the court.

The court finds that (1) Adaptec filed its motion to intervene in a timely manner; (2) Adaptec's interest is closely related to the case at bar; (3) Adaptec's interest can be practically decided by the court if Adaptec intervenes; and (4) no party is representing Adaptec's interests at the present time in this case. The court will grant Adaptec's motion to intervene as a matter of right.

2. *Permissive Intervention.*

Since Adaptec succeeds as a matter of right in its motion to intervene, the court need not address

12

the issue of whether or not Adaptec would also succeed under the theory of permissive intervention.   However, in the interest of clarity, the court notes that under this theory, Adaptec would succeed in its motion to intervene as well.

Fed.R.Civ.P. 24(b)(2) states:

(b) Permissive Intervention.   Upon timely application anyone may be permitted to intervene in an action:  (1) when a statute of the United States confers a conditional right to intervene;  or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.   When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Adaptec satisfies the test for permissive intervention because it can state  (1) an independent ground for jurisdiction;  (2) a timely motion;  and (3) a common question of law and fact between its claim or defense and the main action.  *See Beckman Indus., Inc. v. International Ins. Co.* 966 F.2d 470, 473 (9th Cir.1992), *cert. denied,* 113 S.Ct. 197 (1992) (citations omitted).

**\*6** The court finds that jurisdiction exists under 28 U.S.C. § § 2201, 2202 for Adaptec's declaratory relief action.   The court further has supplemental jurisdiction over the state law contract claims pursuant to 28 U.S.C. § 1367.

As discussed above, the motion was brought in a timely fashion after the point at which Adaptec received Conner's notification of their intent to seek indemnity and tender of the defense of the IBM claims to Adaptec.

Adaptec's claims arise out of the same issues of law or fact as does the main action.

*CONCLUSION*

IT IS HEREBY ORDERED as follows:

(1) Adaptec is permitted to intervene in these actions (Nos. C-93-20117, C-93-20829, C-93-20591) for the purpose of filing and prosecuting its Complaint in Intervention, attached as Exhibit A to its Notice of Motion.

(2) Adaptec shall file its Complaint in Intervention separately with the court within 10 days of entry of this order.

(3) Within 30 days from the filing of the complaint in intervention, Conner shall answer or otherwise plead the complaint in intervention.

SO ORDERED.

FN1. [Adaptec] agrees to protect and hold harmless [Conner] from any and all claims, demands, proceedings, actions, liabilities, and costs resulting from any alleged infringement of patents, trade secrets, copyrights, proprietary information, mask works

and other intellectual property in the United States owned by third parties by Products purchased by [Conner] from [Adaptec], provided [Conner] gives to [Adaptec] prompt notice of any such claim made against [Conner] and authorizes [Adaptec] to settle or defend any such claim, demand, proceeding or action.   Should, as a result of any such claim, demand, proceeding or action, [Conner] be enjoined from selling or using the Product, [Adaptec] shall either (1) procure for [Conner] the right to use or sell the Product;  (2) modify the Product so that it becomes noninfringing or;  (3) upon return of the Product provide to [Conner] a noninfringing Product meeting the same functional specifications as the Product.   In the event the foregoing alternatives are unavailable despite [Adaptec's] diligent efforts, [Adaptec] shall in lieu thereof refund to [Conner] the cost of the Product plus transportation charges.   The foregoing states the entire liability of [Adaptec] for infringement of Patents resulting from combinations of the Product with other products whether or not supplied by [Adaptec].  (*See,* V.P.A.)

1994 WL 706208 (N.D.Cal.)

END OF DOCUMENT

14

**EXHIBIT C**

\\\LA - 81747/0239 - 232220 v1

C

United States District Court, S.D. New York.
Jerome H. LEMELSON, Plaintiff,
v.
LARAMI CORPORATION, Defendant.
**No. 80CIV6081(CES).**

March 23, 1981.

MEMORANDUM DECISION

STEWART, District J.

**\*1** Plaintiff brought suit for alleged contributory infringement of its patented "printing process" against defendant Larami Corporation ("Larami"). Plaintiff's patent allegedly covers the process of transferring wet ink images, such as newspaper comic strips, onto another surface using a silicone putty to pick up the image and a transfer fluid to prepare the receiving surface. Larami allegedly sells silicone putty together with transfer fluid and directions that induce an infringing use. We have before us a motion by Depco, Inc. ("Depco") to intervene pursuant to F.R.Civ.P. 24(b). Depco manufactures transfer fluid and, it is alleged, sold the transfer fluid used by Larami in this case. Rule 24(b) vests us with discretion to permit intervention "when an applicant's claim or defense and the main action have a question of law or fact in common", provided that we consider delay or prejudice to the original parties.

We must first consider what Depco's interest is in the original action. Depco is the manufacturer and vendor to Larami of critical material used in the alleged patent infringement. Plaintiff maintains that Depco is not a direct infringer. But the underlying suit concerns contrioutory infringement or inducement to infringe. From the Depco-Larami contract Depco appears to have known that the transfer fluid would be used in the allegedly infringing transfer process. Therefore, Depco may possibly be liable for contributory infringement under 35 U.S.C. § 271(c) (1976) on the basis of the allegations of the original action. *See ARO Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.,* 377 U.S. 476, 487-88, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). Without considering the contractual obligation to indemnify Larami, Depco has more than a mere vendor's interest in the original action.1 Depco's potential independent liability permits intervention. *See Stewart-Warner Corp. v. Westinghouse Elec. Corp.,* 325 F.2d 822, 826 (2d Cir.1963), *cert. denied,* 376 U.S. 944, 84 S.Ct. 800, 11 L.Ed.2d 767 (1964).

Moreover, as a result of the indemnification agreement, Depco may ultimately bear the burden of a successful patent infringement action against Larami. *See, e.g., United States v. C.M. Lane Lifeboat Co., Inc.,* 25 F.Supp. 410, 411 (E.D.N.Y.1938). If we were to deny Depco's motion to intervene and Larami were to implead Depco under F.R.Civ.P. 14(a), as Larami asserts it would, Depco would be able to assert the invalidity of the patent as a defense which the third-party plaintiff (Larami) has to plaintiff's claim. Thus, the case looks much the same whether Depco is joined as a defendant or impleaded as a third-party defendant. It appears that the question of the invalidity of plaintiff's patent is a claim shared by Depco and Larami and there exist common questions of law and fact between the original suit and Depco's claim.

The potential delay in this case is negligible. Substantially the same discovery that promises to

16

be required in the original action will be undertaken, although other claims and counterclaims may be precipitated by Depco's intervention. Of course, we retain the power to limit permissive counterclaims to those reasonably related to the original action between plaintiff and Larami. *See StewartWarner Corp. v. Westinghouse Elec. Corp.,* 325 F.2d at 828, *cert. denied,* 376 U.S. 944, 84 S.Ct. 800, 11 L.Ed.2d 767. There is some possible prejudice to plaintiff resulting from increased costs and from the forced assertion of related claims against Depco at this time. But the potential prejudice is outweighed by the benefit of fully and finally determining virtually identical claims in one proceeding.

**\*2** In sum, Depco's motion to intervene is granted.

 SO ORDERED.

 1981 WL 319072 (S.D.N.Y.), 32 Fed.R.Serv.2d 1133, 212 U.S.P.Q. 598

END OF DOCUMENT

**EXHIBIT D**

\\\LA - 81747/0239 - 232220 v1

United States District Court,
D. Delaware.
PROXIM INCORPORATED, Plaintiff,
v.
3COM CORPORATION, Symbol Technologies, Incorporated, Wayport Incorporated, and
SMC Networks, Incorporated, Defendants.
**No. C.A.01-155-SLR.**

Feb. 21, 2003.

MEMORANDUM ORDER

<u>ROBINSON</u>, J.

## I. INTRODUCTION

**\*1** On March 8, 2001, plaintiff Proxim brought this suit against defendants 3COM, Symbol Technologies ("Symbol"), Wayport and SMC Networks ("SMC") alleging infringement of several patents owned by plaintiff related to wireless networks. (D.I.1) On December 12, 2001, Intersil Corporation moved for leave to intervene as a co-defendant in the case. (D.I.78) After finding that the thrust of the present litigation was directed against the Intersil PRISM chip set, the court granted Intersil's motion to intervene. (D.I.106) Given the fact that Intersil was also a respondent in an action brought before the ITC by plaintiff related to the same technologies, the court was required to stay this action pursuant to <u>28 U.S.C. § 1659</u>. (*Id.*)

In addition to entering the stay, the court concluded that it would be unfair to allow damages to accrue against defendant Symbol given that Symbol was merely a customer and user of Intersil's PRISM chip set and was not a party to the ITC action. Thus, the court further ordered that plaintiff would be precluded from collecting damages from Symbol that resulted from any alleged infringing conduct during the stay. (*Id.*)

Presently before the court are defendants 3COM, SMC and Wayport's motions to preclude damages from accruing during the stay and plaintiff's motion for reconsideration of the court's order precluding damages from accruing with respect to Symbol. (D.I.107, 108, 110)

## II. STANDARD OF REVIEW

The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Cafe ex-rel. Lou-Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). Accordingly, a court may alter or amend its judgment if the movant demonstrates at least one of the following: (1) a change in the controlling law; (2) availability of new evidence not available when the previous decision issued; or (3) a need to correct a clear error of law or fact or to prevent manifest injustice. *See id.*

## III. DISCUSSION

In its May 30, 2002 order entering the stay, the court was mindful of the concerns posed by

\\\LA - 81747/0239 - 232220 v1

Symbol in its papers opposing the stay. Namely, Symbol was not a party to the ITC action and, therefore, would not have an opportunity to defend itself in that forum. Furthermore, Symbol would be subjected to the uncertainty of conducting business with the impending litigation hanging over it. Given these concerns, the court concluded that in the interests of equity, damages should not be allowed to accrue against Symbol during the stay and pendency of the ITC action. In their motions, defendants 3COM, Wayport and SMC argue that they are in the same situation as Symbol and should be afforded the same protections.

In its motion for reconsideration, plaintiff argues that Symbol would suffer no harm as a result of the stay since it is indemnified against any infringement damages by Intersil. (D.I. 110 at 5) Furthermore, plaintiff argues that the court abused its discretion by precluding it from recovering its full remedies for defendants' alleged infringement. Given the indemnification argument, the court ordered the parties to submit briefing regarding any indemnification agreements they had with Intersil related to this litigation. (D.I.117)

**\*2** In response to this order, Symbol admits that it has an indemnification agreement with Intersil but argues that Intersil has not agreed to full indemnification and, furthermore, Intersil's indemnification agreement is only as good as Intersil's ability and willingness to pay for any potential damages. (D.I.118) The court finds this argument unpersuasive. The terms of Symbol's indemnification agreement with Intersil and its concerns about Intersil's willingness or ability to satisfy its obligations are irrelevant to the inquiry in the present case. The fact that Symbol is indemnified against potential damages in the current case mitigates its claim of harm resulting from the stay. Symbol's ability to enforce its agreement with Intersil is separate from this litigation and, therefore, the court's order precluding damages from occurring during the stay (D.I.106) is vacated in part.

Defendants 3COM, Wayport and SMC merely state that they are not receiving and have not received any indemnification from Intersil related to this litigation. (D.I.119) Plaintiff argues that these responses do little to address the indemnification issues. In particular, plaintiff argues that 3COM and SMC "undoubtedly have contracts with Intersil that address indemnification and warranties applicable to Intersil's PRISM chipset." (*Id.* at 3) Furthermore, under the U.C.C., 3COM and SMC likely have warranty and indemnification claims. In their responding affidavits, neither 3COM nor SMC discuss whether or not they have demanded indemnification or whether they have a right to seek indemnification under their purchase agreements with Intersil. With respect to Wayport, plaintiff argues that Intersil "has already stated that its counsel is defending Wayport here at the expense of another defendant involved in other litigation against Proxim." (*Id.* at 4) Given the vagueness of defendants 3COM, SMC and Wayport's responses, the court concludes that they have failed to show potential harm from the stay requiring the court to preclude damages from accruing during the stay.

IV. CONCLUSION

At Wilmington, this 21st day of February, 2003, for the reasons stated;

IT IS ORDERED that:

1. Defendants 3COM and SMC's motion to preclude damages from accruing during the stay (D.I.107) is denied.

\\\LA - 81747/0239 - 232220 v1

2. Defendant Wayport's motion to preclude damages from accruing during the stay (D.I.108) is denied.

3. Plaintiff's motion for reconsideration (D.I.110) is granted and the court's previous order precluding damages from accruing during the stay with respect to defendant Symbol (D.I.106) is vacated in part.

2003 WL 403348 (D.Del.)

END OF DOCUMENT

\\\LA - 81747/0239 - 232220 v1

**EXHIBIT E**

\\\LA - 81747/0239 - 232220 v1

United States District Court,
S.D. New York.
RATES TECHNOLOGY INC., Plaintiff,
v.
NEW YORK TELEPHONE COMPANY d/b/a Nynex, Telesector Resources Group, Inc.,
Mitsui & Co. (U.S.A.), Inc., and Tamura Electric Works, Ltd., Defendants.
**No. 94 Civ. 9297 (DC).**

July 25, 1995.

Ferber Greilsheimer Chan & Essner, by <u>Robert N. Chan</u>, New York City, - and -James &
Franklin New York City, for plaintiff.

<u>Richard H. Wagner</u>, White Plains, NY, - and - <u>Joel Bossom</u>, New York City, for defendants
Nynex and Trg.

MEMORANDUM DECISION

<u>CHIN</u>, District Judge.

**\*1** Defendants New York Telephone Company d/b/a NYNEX ("NYNEX") and Telesector
Resources Group, Inc. ("TRG") move for an order: (i) staying plaintiff's patent infringement
claim against NYNEX and (ii) dismissing or staying plaintiff's three state law breach of contract
claims. For the reasons that follow, the motion is denied.

*Background*

This dispute concerns debit card pay telephones and a patent licensing agreement among plaintiff
Rates Technology Inc. ("RTI"), NYNEX and its subsidiary TRG. RTI is the beneficial and record
owner of a patent, U.S. <u>Patent 4,122,308 (the "Patent")</u>, which covers certain telephone device
technology. <u>[FN1]</u> (Amended Complaint ("AC") at ¶  8). In late 1991 or January 1992, NYNEX
undertook a market test of debit card pay telephones manufactured by Landis & Gyr, Inc.
("Landis"). (AC at ¶¶  10-11). RTI claimed that the Landis telephones infringed the Patent, and
the dispute was resolved by RTI, NYNEX and TRG entering into a patent license agreement
dated January 13, 1992 (the "Letter Agreement"), pursuant to which RTI granted NYNEX and
TRG a license to use the Landis telephones. (AC at ¶   12). Under the terms of the Letter
Agreement, NYNEX and TRG agreed to pay RTI a license fee for each debit card telephone
utilized in the market test. (AC at ¶  14). NYNEX and TRG also agreed to obtain licenses, and to
ensure that their suppliers had licenses, for any future intended use of technology covered by the
Patent. (AC at ¶  15).

In late 1994 and early 1995, NYNEX installed debit card pay telephones throughout its service
area. These telephones were manufactured by defendant Tamura Electric Works, Ltd. ("Tamura")
and distributed by defendant Mitsui & Co. (U.S.A.), Inc. ("Mitsui") (AC at ¶¶  21-22). Plaintiff
alleges that these telephones infringe the Patent and that defendants do not have a license for this
use. (AC at ¶¶  21-24).

In this action plaintiff alleges four claims:
   (i) Breach of the Letter Agreement by NYNEX and TRG through theirfailure to pay plaintiff

23

the license fee for each of the debit card pay telephones used in their market test (the first cause of action);

(ii) Infringement of the Patent by NYNEX, Mitsui and Tamura (the second cause of action);

(iii) Breach of the Letter Agreement by NYNEX knowingly infringing the Patent by deploying the Tamura and Mitsui debit card pay telephones (the third cause of action); and

(iv) Breach of the Letter Agreement by NYNEX acquiring telephones from suppliers which did not have a valid license for the Patent, thereby denying plaintiff its expected fee (the fourth cause of action).

By order dated March 23, 1995, I stayed discovery against NYNEX and TRG pending disposition of this motion to dismiss.

*Discussion*

1. *Stay of the Patent Claim against NYNEX*

NYNEX and TRG argue that plaintiff's infringement claims against them should be stayed for several reasons: First, NYNEX and TRG are mere customers of the true transgressors, *i.e.,* the manufacturer of the allegedly infringing products, and suits directly against manufacturers are preferred over suits against presumably less culpable customers. Second, Mitsui and Tamura are the real parties in interest and resolution of the claims against them would be dispositive of the patent claims against NYNEX and TRG. Third, fairness and efficiency require that NYNEX and TRG be spared the expense of litigating this matter at this time.

a. *The Customer Suit Exception*

**\*2** As a matter of sound judicial administration, courts have fashioned a  "customer suit" exception to the general rule that where there are two competing lawsuits, the first-filed suit should have priority. Under this exception first-filed patent infringement actions against customers are stayed pending the adjudication of later claims against manufacturers. *See Katz v. Lear Siegler, Inc.,* 909 F.2d 1459, 1464 (Fed. Cir. 1990) (affirming stay of suit against customers pending resolution of separate suit against manufacturer); *William Gluckin & Co. v. Int'l Playtex Corp.,* 407 F.2d 177, 178-79 (2d Cir. 1969) (affirming stay of action against Woolworth Company in favor of separate action against manufacturer); *see also Codex Corp. v. Milgo Elec. Corp.,* 553 F.2d 735, 737-38 (1st Cir.), *cert. denied,* 434 U.S. 860 (1977) (affirming stay granted to determine priorities between competing lawsuits raising the same issue in different forums). The customer suit exception has been applied to different claims within a single lawsuit in the unusual situation where there were 37 defendants, and the 31 customer defendants agreed to be bound by any decision against the manufacturers. *Refac Int'l Ltd. v. IBM,* 790 F.2d 79 (Fed. Cir. 1986), *modified on other grounds,* 798 F.2d 459 (Fed. Cir. 1986) (affirming stay as method of separating claims against 31 customers from claims against 6 manufacturers). The rationale underlying the customer suit exception is that the manufacturer and the patent holder are the true parties in interest, and an action between them is to be favored over an action commenced in another district against a reselling customer of the manufacturer. *William Gluckin & Co.,* 407 F.2d at 178-79.

The customer suit exception is inapplicable to the instant action. First, there is no question of competing lawsuits and no issue of priority between actions. The parties have not cited to any related proceedings, and all the alleged infringers are parties to this action. Nor do the

24

considerations that warranted a stay of the claims against customers in the *Refac* case exist in the present case. In *Refac,* there were 37 defendants, and thus it made sense to simplify the case. Here, there are only three defendants. More importantly, the customers in *Refac* agreed to be bound by the result; NYNEX and TRG have offered no such agreement here.

 Second, NYNEX is not a mere customer of Tamura and Mitsui within the meaning of the "customer suit" exception. *Cf. William Gluckin & Co.,* 407 F.2d at 178. Rather plaintiff alleges that NYNEX studied the Patent during the test market and then induced Tamura and Mitsui to produce infringing telephones. (AC at ¶ 26). Hence, according to the allegations of the amended complaint, NYNEX is not a mere "innocent" customer.

 Third, efficient case management does not require a stay under these circumstances. On the contrary, as the patent claims against defendants Tamura and Mitsui and, as set forth below, the contract claims against NYNEX will be proceeding, efficiency and common sense dictate that the stay be denied.

 **\*3** Therefore, the policy reasons underlying the "customer suit" exception simply do not apply, and no compelling reason exists to stay the patent claims against NYNEX and TRG. This prong of defendants' motion is denied.

 2. *Dismissal of State Law Claims*

 NYNEX next moves to dismiss plaintiff's three state law claims, *i.e.,* the first, third and fourth causes of action of the amended complaint, arguing that the Court lacks subject matter jurisdiction over the first claim and that the third and four causes of action fail to state claims upon which relief can be granted.

 a. *The First Cause of Action*

 The first claim of the amended complaint is that NYNEX and TRG breached the Letter Agreement by failing to pay plaintiff the specified fee for Landis debit card pay telephones employed in the market test. NYNEX and TRG assert that the connection between this breach of contract claim and the patent infringement claim is too tenuous to provide a basis for supplemental jurisdiction.

 Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over state law claims that are part of the "same case or controversy" already before the Court as to which the Court has "original jurisdiction." State and federal claims are part of the same case or controversy if they "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725 (1966).

 The Court has "original jurisdiction" over plaintiff's second cause of action, which asserts a federal claim: patent infringement. Plaintiff's first cause of action alleges that defendants breached a license agreement involving the very same patent at issue in the second cause of action. Hence, the infringement claim and the claim that the infringement breached the Letter Agreement are part of the "same case or controversy" and derive from a "common nucleus of operative fact."

\\\LA - 81747/0239 - 232220 v1

Judicial economy also supports the exercise of jurisdiction under these circumstances. The Court will be adjudicating plaintiff's other claims for breach of the Letter Agreement, and while the first claim raises additional issues, it would be unjust and inefficient to require the parties to litigate the first cause of action in a separate state court action. Accordingly, I will exercise jurisdiction over plaintiff's first breach of contract claim. *See Promisel v. First Am. Artificial Flowers,* 943 F.2d 251, 254 (2d Cir. 1991), *cert. denied,* 502 U.S. 1060, 112 S. Ct. 939 (1992) (noting that the exercise of supplemental jurisdiction over state law claims is not automatic, but "is a favored and normal course of action."). Defendants' motion to dismiss the first cause of action is denied.

### b. *The Third Cause of Action*

NYNEX argues that plaintiff's third claim for relief, which alleges that NYNEX breached the Letter Agreement by knowingly infringing the Patent by deploying the Tamura and Mitsui debit card pay telephones, should be dismissed or stayed. NYNEX seeks dismissal on the grounds that the provision in question is an unenforceable agreement to agree, and that the promise is void under the New York statute of frauds. [FN2]

**\*4** Under the doctrine of contractual definiteness, an agreement to agree may be unenforceable when material terms are left for future negotiations. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247 (1981). As the New York State Court of Appeals has noted: "The doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." *166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp.,* 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687 (1991).

The New York courts, however, do not apply this doctrine rigidly because "strict application ... could actually defeat the underlying expectations of the contracting parties." *Id.,* 78 N.Y.2d at 91, 571 N.Y.S.2d at 688 (citation omitted). Under New York law, a court should endeavor to enforce agreements where it can ascertain what the parties intended, determine whether there has been a breach and fashion a proper remedy. *Id.* A finding that a contract is indefinite and unenforceable "is at best a last resort." *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.,* 232 N.Y. 112, 114, 133 N.E. 370 (1921) (Cardozo, J.).

Therefore, the first inquiry is whether a court could ascertain what the parties intended. According to the amended complaint, NYNEX promised to perpetually forebear from certain infringing conduct, and agreed to leave the terms of any future patent license open to negotiation. (AC at ¶ 31). The Letter Agreement states that: "NYNEX undertakes ... that it will not knowingly infringe any RTI Patent." (AC at ¶ 31). Hence, the Letter Agreement is sufficiently definite for this Court to determine what the parties promised.

The next question is whether a court could determine whether the Letter Agreement has been breached. I believe I can. According to the amended complaint, NYNEX knowingly infringed the Patent in its deployment of the Tamura and Mitsui telephones. (AC at ¶ 32). If plaintiff can prove this allegation, then it may be able to prove a breach of the Letter Agreement.

The last issue is whether a court could fashion a remedy for such an alleged breach. Generally, a plaintiff is entitled to recover the damages that would place it in the same position it would have been in if the agreement had not been violated. *R & I Elecs., Inc. v. Neuman,* 66 A.D.2d 836, 411

26

N.Y.S.2d 401, 403 (2d Dep't 1978). Damages are measured by what the parties reasonably contemplated at the time of contract and by what is demonstrably related to the breach. *Borden v. Chesterfield Farms, Inc.,* 27 A.D.2d 165, 277 N.Y.S.2d 494, 496 (1st Dep't 1967).

 Applying these general principles to the specific circumstances of this case, a court could rely on the Letter Agreement as an objective measure of the parties' expectations. The price and duration of the license for the market test could provide a rough basis for structuring a remedy. While there are inherent difficulties in transferring terms from one type of contract to another, the challenge is not so great as to justify dismissing this claim at this early juncture of the litigation.

 **\*5** NYNEX's second argument is that the alleged promise to forebear from future infringement is void under the statute of frauds. Under the New York statute of frauds, certain agreements must be in writing and subscribed to by the party to be charged. N.Y. Gen. Oblig. Law § 5-701 (McKinney 1989 & Supp. 1995). Courts have also held that the writing must contain all the essential terms of the agreement. *See, e.g., Paper Corp. of the United States v. Schoeller Technical Papers, Inc.,* 742 F. Supp. 808, 810 (S.D.N.Y. 1990).

 Here, of course, there is a writing; the Letter Agreement is a writing signed by the parties. However, NYNEX argues that the alleged promise does not contain all the required terms. This argument assumes that plaintiff is seeking performance of an indefinite future license. Plaintiff responds that it is not seeking to enforce a future license, but rather alleges breach of the promise to forebear from infringing.

 At this early phase of the case, I cannot conclude as a matter of law that the Letter Agreement is void because it fails to contain all the essential terms of an agreement not to infringe plaintiff's patents. Therefore, NYNEX's motion to dismiss the third claim is denied.

 NYNEX moves, in the alternative, for a stay of this claim, based on "the same considerations that make it appropriate to stay Plaintiff's patent infringement claim as to NYNEX." (NYNEX Mem. at 21). I have denied the request to stay the patent infringement claim, and no compelling reason exists to stay the third cause of action. The alternative request for a stay is also denied.

 c. *The Fourth Cause of Action*

 Finally, NYNEX moves to dismiss or stay plaintiff's fourth claim, which alleges that NYNEX breached the Letter Agreement by acquiring telephones from suppliers that did not have a valid license for the Patent, thereby denying plaintiff its expected fee. NYNEX argues that this claim should be dismissed on two grounds: First, the promise is too indefinite to be enforceable. Second, the Letter Agreement is an unambiguous, integrated contract and the parol evidence rule bars this claim as a matter of law.

 For the same reasons set forth above, I find that the promise to forebear from certain conduct, *i.e.,* buying from suppliers without licenses, is sufficiently definite to survive this motion to dismiss. See *Don King Prods., Inc. v. Douglas,* 742 F. Supp. 741, 762-63 (S.D.N.Y. 1990) (holding that a New York contract that left certain terms open to future negotiation was sufficiently definite).

 NYNEX alternatively argues that this claim is an impermissible attempt to enforce negotiating positions that were never meant to be binding. NYNEX asserts that these prior and

contemporaneous discussions are inadmissible under the parole evidence rule.

Construing the amended complaint in the light most favorable to plaintiff, as I must at this point, the fourth claim is not barred by the parol evidence rule. Plaintiff is simply alleging a different theory of breach, *i.e.,* failure to pay plaintiff its expected fee, and an alternative method for calculating damages. Therefore, NYNEX's motion to dismiss the fourth claim is denied.

*Conclusion*

**\*6** The motion of defendants NYNEX and TRG to stay or dismiss plaintiff's claims is denied in all respects. Discovery may proceed on all claims against all parties. A status conference will be held on October 13, 1995 at 10 a.m. in Courtroom 11A of the 500 Pearl Street Courthouse.

SO ORDERED.

> FN1.  For the purposes of deciding this motion to dismiss, the material facts alleged in the amended complaint must be accepted as true. *See Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir. 1993), *cert. denied,* 115 S. Ct. 572 (1994).

> FN2.  The Letter Agreement provides in relevant part:
> "NYNEX undertakes, now and in any future deployment of debit card pay telephone technology, that it will not knowingly infringe any RTI Patent of which it has notice without first obtaining for itself, or ascertaining that its supplier has obtained, a valid patent license covering NYNEX's intended use of such patented technology." (AC at ¶ 15).

1995 WL 438954 (S.D.N.Y.)

END OF DOCUMENT

\\\LA - 81747/0239 - 232220 v1

**EXHIBIT F**

\\\LA - 81747/0239 - 232220 v1

United States District Court,
N.D. California.
TECHNOLOGY LICENSING CORPORATION, Plaintiff,
v.
GENNUM CORPORATION, Defendant.
**No. 3:01-CV-4204-RS.**

March 26, 2004.

J. David Black, Patrick W. Ma, Warren S. Heit, White & Case LLP,  John Arai Mitchell, Katten Muchin Zavis Rosenman, Palo Alto, CA, Michael A. Dorfman, Timothy J. Vezeau, Katten Muchin Zavis Rosenman, Chicago, IL, for Plaintiff.

Donald McCarthy, Sarah Anne Silbert, Theodore S. Maceiko, Jones Day Reavis & Pogue, Mary Agnes Tuck, Omer Salik, Jones Day, Los Angeles, CA, for Defendant.

ORDER GRANTING IN PART GENNUM'S IN LIMINE MOTION TO EXCLUDE TLC'S REASONABLE
ROYALTY METHODOLOGY

SEEBORG, Magistrate J.

### I. Introduction

**\*1** Defendant Gennum Corporation ("Gennum") filed a motion in limine to exclude plaintiff Technology Licensing Corporation's ("TLC") theory and claim for reasonable royalty damages, including the testimony of its damages expert, Mr. Nicholas Feakins ("Feakins"), based on the contention that TLC's measure of damages fails to comport with controlling Federal Circuit law. Alternatively, Gennum requested that the Court hold a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to assess the reliability and methodology of TLC's damages expert. The Court granted Gennum's request for a hearing and conducted a *Daubert* proceeding on March 19, 2004. Based on all papers filed to date, as well as on the oral argument of counsel at the hearing, the Court grants Gennum's motion to exclude evidence and testimony regarding part of Feakins' reasonable royalty methodology, for the reasons set forth below. Specifically, Feakins may testify with respect to a portion of his proposed reasonable royalty analysis as further described in this order. The remainder of his proffered testimony, however, will be excluded at trial.

### II. Background

This action concerns conflicting claims of invalidity and infringement of two United States Patents, Nos. 5,486,869 ("the '869 patent") and 5,754,250 ("the '250 patent"), both of which are titled, "Synchronizing Signal Separating Apparatus and Method" and describe generally an invention which detects and synchronizes video type signals to improve such signals and create clearer, sharper pictures on receiving equipment, such as televisions. The '250 patent is a continuation-in-part of the '869 patent. The named inventor on both patents is J. Carl Cooper, who assigned all substantial rights in the patents to TLC, his licensing company.

Gennum is a Canadian, high-technology company that designs, manufactures, and markets silicon integrated circuits ("ICs"), chips, modules, and thin-film hybrid microcircuit components

for a variety of applications in three target markets: video products, hearing instrument products, and data communications. At issue in this dispute are two families of chips manufactured by Gennum, the GS1881, GS4881, and GS4981 sync separators ("the '81 products") and the GS4882 and GS4982 sync separators ("the '82 products"), which TLC alleges infringe various claims of the '869 and '250 patents, either directly under 35 U.S.C. § 271(a), or indirectly under 35 U.S.C. § 271(b) and/or (c). [FN1]

> FN1. This action initially was filed by TLC against third-party, Videotek, Inc. In May of 2002, Videotek filed a third-party complaint against Gennum, alleging that Gennum manufactured semiconductor chips which Videotek then incorporated into products that TLC contends infringe its patents. Gennum answered Videotek's complaint and filed a cross-complaint against TLC for declaratory judgment of non-infringement and invalidity of the '869 and '250 patents. TLC answered Gennum's complaint and counter-claimed for infringement. The only claim at issue in this trial is Gennum's claim for declaratory relief as to validity and non-infringement. All remaining claims have been stayed by Judge Breyer. The underlying dispute between TLC and Videotek has been resolved.

Trial is presently scheduled to begin on April 6, 2004. Accordingly, the Court conducted a *Daubert* hearing to address the methodology utilized by TLC's expert in calculating TLC's damages. Rule 702 of the Federal Rules of Evidence permits an expert to testify if such testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court directed that under Rule 702, the trial judge must ensure expert testimony based on scientific, technical or other specialized knowledge is not only relevant but reliable. *Id.* at 589. *Daubert's* "gatekeeping" obligation has subsequently been extended to cover all expert testimony, not just that characterized as "scientific." *See Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *DSU Medical Corp. v. JMS Co., Ltd.,* 296 F.Supp.2d 1140 (N.D.Cal.2003).

**\*2** During his deposition, Feakins conceded that the methodology he advances in this case: (1) has not been tested; (2) has not been subjected to peer review and publication; and, (3) has not gained acceptance as a method for patent damages calculation. *See* Feakins Deposition at pp. 252-253. [FN2] While acknowledging Federal Circuit caselaw holds that a reasonable royalty calculation is based on a hypothetical negotiation between the patentee and the infringer before the infringing activity began, *Integra Lifesciences I. Ltd. v. Merck KGAA,* 331 F.3d 860, 869 (Fed.Cir.2003), Feakins explains that, in his view, such an award here would not adequately compensate TLC for the infringement by Gennum, as required by 35 U.S .C. § 284 (2000) (damages in a patent infringement case are awarded "to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."). *See* Feakins Depo. at p. 234. Therefore, Feakins testified that, in addition to calculating a reasonable royalty rate which would have been reached between Gennum and TLC, he applied a multiplier to compensate TLC "because of the discrepancy in selling prices between a manufacturer of a component and a manufacturer of a finished product." *See* Feakins Deposition at 240; Feakins' Report, dated August 17, 2003 at p. 11.

> FN2. Gennum does not dispute that Feakins is qualified to testify as a damages expert in patent cases.

31

Gennum argues that the Court should exclude TLC's reasonable royalty methodology, as reflected in Feakins' analysis, under the *Daubert* and *Kumho* cases. It contends that the methodology proposed by TLC is neither reliable, relevant, nor consistent with prevailing Federal Circuit law. Consequently, Gennum posits that the Feakins' methodology should be precluded under Evidence Rules 402 and 403 because such proffered testimony will not "assist the trier of fact to understand the evidence or determine a fact in issue." Fed.R.Evid. 702.

TLC responds that Feakins' expert reports are based on sufficient facts and data in support of its theory that Gennum's manufacture and sale of infringing chips has enabled the further infringement by manufacturers, such as Videotek and Ross Video, whose use of the infringing Gennum chips dramatically increases the value of their products.

### III. Legal Standards

Federal Rule of Evidence 702 provides that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. Accordingly, *Daubert* requires that the trial judge determine "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts at issue." Daubert, 509 U.S. at 592-593. To aid the trial judge in making this determination, the *Daubert* Court provided a list of non-exclusive factors to consider, including:

**\*3** (1) whether the scientific theory or technique can be (and has been) tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) whether there is a known or potential error rate; and,

(4) whether the theory or technique is generally accepted within the relevant scientific community.

*Daubert* at 592-594.

"Thus, trial judges are responsible for determining whether the knowledge of the expert, whether scientific, technical, or specialized, is based upon the application of reliable theories or techniques. The proponent of the testimony must establish admissibility by a preponderance of the evidence." DSU Medical Corp. v. JMS Co., Ltd., 296 F.Supp.2d at 1146, *citing Bourjaily v. United States,* 483 U.S. 171, 175-176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

Further, the Supreme Court has held that, in cases involving non-scientific testimony, district courts are not limited to the *Daubert* factors in assessing the reliability of the proffered expert testimony. Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. at 150-151. Rather, they enjoy broad discretion in determining both how to assess reliability and whether it exists. *Id.*

Notwithstanding that broad discretion, in determining the reliability of expert testimony, the trial court is limited to considering the methodologies relied upon by the expert, rather than the conclusions reached by such expert. See U.S. v. Bonds, 12 F.3d 540, 563 (6th Cir.1993). "It is not the trial court's role to determine whether the expert's conclusions are actually correct." *Id.;* 4-702 Weinstein's Federal Evidence § 702.05. Rather, the trial court's sole purpose is to determine the reliability of a particular expert's opinion through a preliminary assessment of the methodologies supporting such opinion. Daubert, 509 U.S. at 592-593. If a trial court finds that "there is simply too great an analytical gap between the data and the opinion proffered," then the evidence may be

excluded. *DSU Medical Corp. v. JMS Co., Ltd.,* 296 F.Supp.2d at 1147; quoting in part, *General Elec. Co. v. Joiner,* 522 U.S. 136, 147, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

In this regard, the *DSU Medical Corp.* decision, as well as the *Micro Chemical, Inc. v. Lextron, Inc.,* 317 F.3d 1387 (Fed.Cir.2003) case discussed therein, are instructive since both cases distinguish between the trial court's factual review, which generally falls outside the scope of its gatekeeping role, and review of the legal methodology underlying the expert's opinion, which generally remains within it. In *Micro Chemical,* the Federal Circuit affirmed the trial court's finding that the proffered expert testimony properly applied the conceptual framework of a hypothetical negotiation between patentee and alleged infringer in computing reasonable royalty damages. *Micro Chemical,* 317 F.3d at 1393-1394. Since the applicable factors had been properly applied to the disputed facts, the trial court concluded, and the Federal Circuit agreed, that the expert was not legally erroneous in his methodology and could, therefore, testify at trial.

**\*4** In contrast, the *DSU* court recently concluded that expert testimony was inadmissible at trial because the proffered methodology was not grounded on established legal principles and was so divorced from the economic realities of the situation as to be speculative. *DSU,* 296 F.Supp.2d at 1156. In a well-reasoned and detailed opinion, Judge Jensen of this Court reviewed the gatekeeping function set forth in the *Daubert* and *Kumho* cases and concluded that the proffered opinion of the patent damages expert must be excluded since it was based on unacceptable methodology. *Id.* [FN3]

> FN3. The *DSU* decision obviously belies TLC's assertion that no court has ever excluded the testimony of a patent damages expert in conjunction with a *Daubert* hearing.

## IV. Discussion

Title 35 U.S.C. § 284 provides that "[U]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284 (2002). Thus, the statute establishes a floor below which damage awards may not fall. *Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320, 1326 (Fed.Cir.1987).

The general rule for determining actual damages to a patentee that is itself producing the patented item is to determine the sales and profits lost to the patentee because of the infringement. *Id.* at 1326; *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 83 F.2d 1573, 1577 (Fed.Cir.1989). In those cases for which a patentee cannot establish entitlement to lost profits, the statute provides entitlement to no less than a reasonable royalty on an infringer's sales. 35 U.S.C. § 284 (2002); *Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078 (Fed.Cir.1983) ("If actual damages cannot be ascertained, then a reasonable royalty must be determined."). The royalty may be based upon an established royalty, if there is one, or, if not, upon the results of a hypothetical negotiation between the patentee and the infringer. *Id.* The hypothetical negotiation requires that the court envision a licensing agreement reached between the parties at the time the infringement began. *Id.* [FN4]

> FN4. This hypothetical negotiation is also referred to as a "willing licensor/willing licensee" negotiation. Of course, the courts have recognized that this is an inaccurate, even fanciful, construct when, as here, the patentee does not wish to grant a license. *Rite-*

_Hite Corporation v. Kelley Company, Inc.,_ 56 F.3d 1538, 1554, fn. 13 (Fed.Cir.1995).

 The parties here concede that lost profit damages are not available since TLC does not manufacture or produce any product. Rather, it is simply engaged in the business of licensing the technology covered by the patents assigned to it. Therefore, TLC contends that it is relying on a reasonable royalty damages theory in this action. More specifically, TLC's expert, Feakins, opines that in this particular circumstance, the appropriate measure of damages is to "determine the total royalties that TLC would have received from product manufacturers had it been able to license its technology to them." _See,_ Feakins Report, dated August 17, 2003 at p. 10. Feakins explains that, although TLC has established standard royalty rates of 7.2% for commercial products and 1.8% for consumer products, the use of such rates in this case "would work an injustice because of the enormous economic harm the Defendants have inflicted upon TLC by taking from it the far greater royalties that TLC would have enjoyed had its technology not been misappropriated by Gennum, and instead, it had received royalties from product manufacturers." _Id._

 **\*5** Accordingly, Feakins states that the starting point for the damages calculation here "is to determine what royalty rate the parties would have arrived at had Gennum manufactured a finished product." _Id._ at p. 11. Since Gennum does not, however, engage in such manufacture, Feakins examined the selling price of a finished product for one of Gennum's customers: Videotek. That company's finished products, according to Feakins, sell for 5,320 times more than the relevant Gennum chips, which sell for $2.60 per piece. [FN5] Therefore, Feakins assumes that the royalty obtained by TLC would have been proportionately greater because of the increased profit contribution generated by manufactured products. Based on his calculations, Feakins concludes that the royalty would be roughly 10,981 times greater if TLC licensed manufacturers of finished products than if TLC simply licensed component parts manufacturers such as Gennum. [FN6]

> FN5. All prices reflect Canadian dollars, as stated in Feakins report.

> FN6. _See_ Feakins Report, dated August 17, 2003, at p. 8.

 Feakins then examines Gennum's average gross profits on its infringing chips for the time period between 1993 and 2003. Feakins concludes that Gennum's average profits on these chips for this time period were 34%. He then subtracts 5% for sales and marketing costs and concludes that Gennum enjoyed an average profit contribution of 29% on its infringing products from 1993 to 2003.

 Feakins next opines that it is reasonable to assume, based on his profit calculation, that the parties would have agreed to a royalty rate between the 7.2% standard rate charged by TLC and the 29% profit margin realized by Gennum. He then concludes that "the most reasonable assumption is that the parties would split the 22% difference even, i.e., that a reasonable royalty rate would be approximately 18% (i.e., 11% + 7.2%), which would leave Gennum with a reasonable profit after paying the royalty." _Id._

 Feakins further concludes that the application of an 18% royalty rate in this case would be unjust based on TLC's contention that it would have enjoyed royalties from product manufacturers had its technology not been misappropriated by Gennum. Therefore, Feakins states that the calculated

34

royalty rate must be multiplied by two additional numbers in order to calculate the total amount of damages suffered by TLC. These numbers are 10,981 [FN7] and one-half of 1% of Gennum's 316 customers [FN8] who purchased allegedly infringing components. Based on this methodology, Feakins concludes that TLC's total damages in this case are $77,248,235.00.

> FN7. This number represents the greater royalty that Feakins contends TLC would have been able to obtain had it been able to license end product manufacturers. Feakins Report, dated August 17, 2003, at p. 8.

> FN8. Feakins testified that, statistically, this number would be fewer than two customers. Feakins Deposition at p. 240.

During his deposition, Feakins conceded his conclusion that TLC would have been able to license one-half of 1% of Gennum's customers was "purely judgmental" on his part. *See* Feakins Deposition at pp. 240, 242. He further conceded that he had not done any analysis, investigation or study of which two or fewer of Gennum's customers TLC would have been able to license, as represented by this figure. *Id.* at 240-241. Feakins also acknowledged that TLC is unaware of the identity of Gennum's customers, *id.* at 243-244, or the existence of any judicial decisions which supports his use of a multiplier in calculating reasonable royalty damages. *Id.* at 252. In fact, Feakins concedes that this is the first case in which he has posited his theory that a multiplier should be used. *Id.* Nevertheless, Feakins contends that the support for his theory is derived from Federal Circuit caselaw, namely, the *Stickle v. Heublein, Inc.,* 716 F.2d 1550 (Fed.Cir.1983) and *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098 (Fed.Cir.1996) cases.

**\*6** In *Stickle,* the Federal Circuit held that, while the district court correctly proceeded to determine a reasonable royalty based on a hypothetical negotiation, it failed to consider "the actual negotiations between the parties" as well as evidence introduced by the defendant which negated that a royalty based on the number of units produced by its machine would flow from such hypothetical negotiations. *Id.* at 1561. Therefore, the Federal Circuit concluded, after reviewing the evidence omitted from the district court's analysis, that a royalty must be based on a lump-sum payment for each machine rather than on the defendant's production. *Id.* at 1563. In so doing, the Court noted that the trial court could award an amount of damages greater than a reasonable royalty so that the award would be adequate to compensate for the infringement. The Circuit stated that "the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a 'heads-I-win, tails-you-lose' position." *Stickle* at 1563, quoting *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158 (6th Cir.1978). It then concluded that an increase in the damages award could be stated as either a reasonable royalty *for an infringer,* as in *Panduit,* or as an increase in the reasonable royalty determined by the trial court in its discretion. *Id.*

In *Maxwell v. J. Baker, Inc.,* 86 F.3d at 1110, the Federal Circuit determined that the jury's award based on both a reasonable royalty and on its determination that the patent owner was damaged in excess of the royalty amount was proper and supported by substantial evidence. The Circuit reiterated that reliance on the hypothetical negotiation model for determining damages "risks creation of the perception that blatant, blind appropriation of inventions patented by individual, nonmanufacturing inventors is the profitable, can't-lose course." *Id.* at 1109, quoting *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568, 1575 (Fed.Cir.1988). It noted that, to avoid

such a result, the fact finder may consider additional factors to determine adequate compensation for the infringement. _Maxwell,_ 86 F.3d at 1109. "These factors include royalties received by the patentee for the licensing of the patent in suit, opinion testimony of qualified experts, the patentee's relationship with the infringer, and other factors that might warrant higher damages. _See Georgia-Pacific Corp. v. United States Plywood Corp.,_ 318 F.Supp. 1116, 1120 (S.D.N.Y.1970)." _Id._ The fact that an infringer had to be ordered by a court to pay damages may also be considered by the fact finder. _Id_ . at 1110.

 The _Maxwell_ court also noted that its opinion was not inconsistent with its earlier decision in _Mahurkar v. C.R. Bard, Inc.,_ 79 F.3d 1572 (Fed.Cir.1996), in which it had held that a district court may not increase a reasonable royalty by a "kicker" based on litigation or other expenses. "Here, the court did not award enhanced damages or fees. Instead, pursuant to instructions from the court, the jury awarded damages adequate to compensate Maxwell for the infringement, as called for by the statute." _Maxwell,_ 86 F.3d at 1110, fn. 4.

 **\*7** It is clear from a review of both the _Stickle_ and _Maxwell_ cases, as well as the additional authorities cited therein, that the Federal Circuit has sanctioned the application in appropriate cases of additional factors to the fact finder's determination of a reasonable royalty based on the existence of a hypothetical negotiation between the patent holder and licensee. These factors are identified and discussed extensively in _Georgia-Pacific Corp. v. United States Plywood Corp.,_ 318 F.Supp. at 1120. However, it is equally clear from these cases that the Federal Circuit has never sanctioned the application of a multiplier to a reasonable royalty, as Feakins proposes to do in the present case.

 TLC acknowledges that Feakins' approach is "novel" but argues, nonetheless, that it is a permissible extension of the Federal Circuit's analysis in the _Stickle_ and _Maxwell_ cases and should, therefore, be permitted to be presented to the jury for determination. TLC notes that a district court recognized that while "thorny problems of admissibility arise when an expert seeks to base his opinion on novel or unorthodox techniques that have yet to stand the tests of time to prove their validity," _see, Cayuga Indian Nation of New York v. Pataki,_ 83 F.Supp.2d 318, 323 (S.D.N.Y.2000), nevertheless, novel expert testimony does not automatically offend Rule 702. The _Cayuga_ decision, however, is not helpful or instructive in this particular instance because that case presented a unique situation in which all three expert appraisers _agreed_ that they were faced with a novel appraisal issue and, therefore, were required to rely upon their own training, experience, and education to devise a valuation methodology which each believed workable for the unprecedented task. _Id._

 This patent infringement action does not present such a novel situation. Rather, this case involves a patent holder seeking relief for the alleged infringement of its patents from a component manufacturer. Neither party, including TLC, suggests that this action presents a case of first impression. To the contrary, Feakins classifies his methodology as an application of the Federal Circuit's ordinary, reasonable royalty damages calculation. _See_ Feakins Deposition at pp. 250-251. However, rather than adopting the approach applied by the _Maxwell_ court  [FN9] and determining, first, a reasonable royalty and, second, applying the factors enunciated in _Georgia-Pacific_ to ascertain any additional damages award which might arguably be sufficient fully to compensate TLC for the infringement, Feakins admittedly created a novel methodology wherein he simply "used his judgment" to arrive at figures he determined were "reasonable" and "conservative" based purely on the profits of one of Gennum's customers: Videotek. _See_ Feakins Deposition at

36

pp. 240-244.

> FN9. In fact, Feakins concedes that no case has ever applied the methodology he now advocates. Feakins Deposition at p. 252.

TLC has failed to present any evidence to support its assertion that it is reasonable or permissible to utilize Videotek's profit margins, rather than Gennum's, simply because Videotek is an end user. Feakins posits two reasons for this approach: (1) it would never be in TLC's interest to license its technology to a component manufacturer because such party's profits margins will always be substantially less than those of the manufacturer of the finished product and, (2) Gennum has inflicted "enormous economic harm" upon TLC by "taking from it the far greater royalties that TLC would have enjoyed had its technology not been misappropriated by Gennum." *See* Feakins Report, dated August 17, 2003, at pp. 7, 10. These arguments are, however, both factually and legally flawed.

**\*8** First, TLC has presented no evidence either that the custom and practice in the industry is for a licensor to negotiate with an end-user rather than with a component parts manufacturer or that it has successfully implemented such an approach. Second, there is no evidence which supports TLC's assertion that Gennum's conduct operated to take from it "far greater royalties" than TLC would have otherwise obtained. Not only is the record completely devoid of any evidence that, prior to this litigation, TLC had negotiated a license with any of Gennum's end-users, but moreover, Feakins conceded that he was unaware of any impediment to TLC seeking to obtain such licenses.  [FN10] *See* Feakins Deposition at pp. 220, 231, 241. Third, the record indicates that TLC offered Gennum a license at 7.2%. Feakins completely ignores this fact and simply concludes, with no factual or legal support, that the use of an established royalty rate in this case would be unjust. This approach was expressly rejected by the Federal Circuit in *Stickle* (trial court improperly failed to consider the actual negotiations between the parties, *see*, <u>Stickle v. Heublein, 716 F.2d at 1561).</u>

> FN10. TLC's only support for its "hampering" argument consists of purely anecdotal arguments that Gennum entered into a "Joint Defense Agreement" with its end users. Even assuming that such an agreement exists, there is no evidence which shows that TLC attempted to license such end users but was prevented from doing so by Gennum. Similarly, TLC points to a letter it wrote to Ross Video inquiring as to whether such end user used Gennum's infringing chips. Again, however, even assuming Ross Video utilized Gennum's chips, there is no evidence submitted which shows that Gennum prevented TLC from negotiating a license with Ross Video or that such a license was ever obtained by TLC.

As the district court in *DSU* recently noted, the Court may not exclude expert testimony simply because it disagrees with the results stated by the expert. <u>DSU Medical Corp. v. JMS Co., Ltd., 296 F.Supp.2d at 1156.</u> However, there is a "threshold issue of admissibility" which requires the Court to examine the connection between the opinion proffered and the reconstructed market data. *Id.* "If there is a sufficient connection, the opinion is admissible with its weight to be determined by the fact-finder. However, if there is too great an analytical gap between the two, the opinion is inadmissible." *Id.*

Feakins correctly opines that the Federal Circuit mandates damages be awarded on a basis which

fully compensates the patent holder for the infringement. He also correctly notes that, in some instances, such a determination will require the trier of fact to calculate not only a reasonable royalty, but an additional amount, in order to assure that compensation is full and adequate. <u>Maxwell,</u> 86 F.3d at 1109. In fact, Feakins does examine Gennum's average gross profits on its infringing chips and concludes that Gennum enjoyed an average profit contribution of 29%. He then postulates that, based on the 7.2% standard royalty rate charged by TLC, and the 29% profit margin realized by Gennum, the parties would have agreed to a royalty rate between these two figures which, in his opinion, would have been negotiated at an 18% royalty. While this conclusion may be subject to attack at trial, it at least purports to be a reasonable royalty method of damages analysis. Therefore, Feakins may testify as to his calculations and opinions regarding this royalty rate.

  However, once Feakins calculates the royalty rate which might have been negotiated between the parties, his analysis and methodology sails into unchartered waters with Federal Circuit law nowhere in sight. Rather than reconstruct the market data to account for factors actually encountered by the parties to determine an additional amount of damages which might compensate TLC for infringement, Feakins' methodology contains "analytical gaps" by applying a multiplier to the royalty rate which is based on purely fictional circumstances. These "gaps" appear in several places throughout Feakins' methodology.

  **\*9** First, Feakins states that he must determine "what royalty rate the parties would have arrived at *had Gennum manufactured a finished product."* Feakins Report, dated August 17, 2003, at p. 11. As noted above, however, there is no factual or legal support provided by Feakins as to why he must adopt that fiction with respect to Gennum's place in the manufacturing process. This determination is not contemplated by either the statute or the caselaw, all of which hold that the starting point of the damages calculation is the hypothetical negotiation between the "willing licensor and the willing licensee." Instead, Feakins imagines a hypothetical negotiation, in reality, between TLC and one of Gennum's customer's, Videotek. This approach is not legally or factually sanctioned.

  Feakins then continues to navigate outside the appropriate expert harbor. He takes his reasonable royalty "times 10,961 times one-half of one percent [of 316]." *See* Feakins Report, dated August 17, 2003, at p. 12. The 10,961 figure purportedly represents how many times greater the royalty *would have been* had TLC licensed its technology to a finished product manufacturer, such as Videotek, rather than to Gennum, a component parts manufacturer. Again, therefore, this figure represents a hypothetical situation which might have existed between TLC and a third party and is not based on a hypothetical negotiation between TLC and Gennum. Similarly, the one-half of 1% of 316 represents the hypothetical number of Gennum's customers which Feakins assumes would have negotiated a license from TLC. Feakins concedes that this number is "purely judgmental" and lacks any legal or factual foundation. Feakins Deposition at pp. 240-242.

  The Federal Circuit instructs that application of an additional amount, over and above a royalty rate, must be based on realistic, appropriate factors, such as royalties actually received by the patentee and the patentee's relationship with the infringer. *Id.* Such an additional amount may not be based on hypothetical situations which are unrealistic or on conditions which do not exist in the marketplace, such as those posited by Feakins. Feakins' application of a multiplier, which is comprised of two separate figures as noted above, renders his methodology improper. Feakins' justification for his use of a multiplier is based on the faulty factual premise that TLC would have

been able to license its technology to at least two manufacturers which utilize Gennum's allegedly infringing chips had Gennum not prevented the realization of such negotiations. With this scenario in mind, Feakins attempts to create a methodology which supports his theory. However, that theory, and the methodology used to implement it, fails to comport with applicable Federal Circuit law which nowhere sanctions the use of a multiplier as Feakins employs to determine adequate compensation for infringement. Such an enhancement to the reasonable royalty calculation is simply untethered by legal or factual support.

### V. Conclusion

**\*10** For the reasons set forth above, TLC's proffered damages expert, Nicholas Feakins, will be precluded from rendering a patent damages analysis that purports to enhance a reasonable royalty calculation through the application of a multiplier.

2004 WL 1274391 (N.D.Cal.)

END OF DOCUMENT

\\\LA - 81747/0239 - 232220 v1