```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4      AstraZeneca Pharmaceuticals LP,    )
       AstraZeneca UK Limited, IPR        )
5      Pharmaceuticals Inc., and          )  Civ. No.
       Shionogi Seiyaku Kabushiki Kaisha  )  07-806-JJF-LPS
6          Plaintiffs,                    )
           V.                             )
7      Sun Pharmaceutical Industries,     )
       Ltd.,                              )
8          Defendant.                     )
       _____
9      AstraZeneca Pharmaceuticals, LP,   )
       AstraZeneca UK Limited, IPR        )
10     Pharmaceuticals Inc., and          )  Civ. No.
       Shionogi Seyaku Kabushiki Kaisha   )  07-809-JJF-LPS
11         Plaintiffs,                    )
       V.                                 )
12     Apotex Inc. And Apotex Corp.,      )
           Defendants.                    )
13     _____
       AstraZeneca Pharmaceuticals, LP,   )
14     AstraZeneca UK Limited, IPR        )
       Pharmaceuticals Inc., and          )  Civ. No.
15     Shionogi Seyaku Kabushiki Kaisha   )  07-810-JJF-LPS
           Plaintiffs,                    )
16     V.                                 )
       Aurobindo Pharma Ltd. And          )
17     Aurobindo Pharma USA Inc.,         )
           Defendants.                    )
18     _____

19     AstraZeneca Pharmaceuticals, LP,   )
       AstraZeneca UK Limited, IPR        )
20     Pharmaceuticals Inc., and          )  Civ. No.
       Shionogi Seyaku Kabushiki Kaisha   )  07-811-JJF-LPS
21                                        )
           Plaintiffs,                    )
22     V.                                 )
       Cobalt Pharmaceuticals Inc., and   )
23     Cobalt Laboratories Inc.           )
           Defendants.                    )
24     _____
```

```
 1                    Thursday, July 3, 2008
                     10:00 a.m.
 2                   Courtroom 2A

 3                   844 King Street
                     Wilmington, Delaware
 4
        BEFORE:  THE HONORABLE LEONARD P. STARK,
 5               United States District Court Judge

 6      APPEARANCES:

 7               FINNEGAN, HENDERSON, FARABOW, GARRETT
                 & DUNNER, LLP
 8               BY:  CHARLES LIPSEY, ESQ.
                 BY:  MARY FERGUSON, ESQ.
 9
                    -and-
10
                 CONNOLLY, BOVE, LODGE & HUTZ LLP
11               BY:  MARY W. BOURKE, ESQ.

12                  -and-

13               FITZPATRICK, CELLA, HARPER & SCINTO
                 BY:  HENRY RENK, ESQ.
14

15               Counsel for Plaintiff AstraZeneca

16
                 MICHAEL BEST & FRIEDRICH LLP
17               BY:  THOMAS P. HENEGHAN, ESQ.
                 BY:  JEFFREY S. WARD, ESQ.
18
                    -and-
19               BAYARD
                 BY:  RICHARD D. KIRK, ESQ.
20
                 Counsel for Defendant Aurobindo
21

22

23

24
```

```
 1                    KATTEN MUCHIN ROSENMAN LLP
                      BY:  ROBERT B. BREISBLATT, ESQ.
 2
                           -and-
 3

 4                    POTTER, ANDERSON & CORROON LLP
                      BY:  RICHARD HORWITZ, ESQ.
 5
                           Counsel for Defendant Apotex
 6
                      FOLEY & LARDNER
 7                    BY:  JEREMY EDWARDS, ESQ.
                      BY:  STEVEN MADDOX, ESQ.
 8
                           Counsel for Defendant Cobalt
 9
                      MORRIS JAMES LLP
10                    BY:  MARY MATTERER, ESQ.

11                         -and-

12                    RAKOCZY, MOLINO, MAZZOCHI, SIWIK LLP
                      BY:  ERIC HUNT, ESQ.
13
                           Counsel for Defendant Mylan
14
                      ABRAMS & LASTER LLP
15                    BY:  JOHN M. SEAMAN, ESQ.

16                         -and-

17                    WINSTON & STRAWN LLP
                      BY:  JOHN K. HSU, ESQ.
18
                           Counsel for Defendant Sun
19

20

21

22

23

24
```

```
 1              THE COURT:   Good morning,

 2   everyone. We have a full house. I would like to

 3   begin in some fashion by knowing who is in front

 4   of me and if you could indicate if you're

 5   planning to speak as well.

 6              MR. LIPSEY:   If I may, Your Honor,

 7   I'm Charles Lipsey from the Finnegan Henderson

 8   firm representing the plaintiffs, whom I shall

 9   collectively refer to as AstraZeneca.  I will do

10   most of the talking unless I fall in battle, at

11   which point my colleagues will stand to replace

12   me.

13              I'm joined by my colleague Mary

14   Ferguson from our Boston office and by Mary

15   Bourke from Connolly Bove.  I'm also joined by

16   Mr. Henry Renk from the Fitzpatrick Cella firm

17   in New York, Mr. Tom Stevens from AstraZeneca,

18   and Dana Hamm from Connolly.

19              We have some suggestions for how

20   to proceed when the time comes, Your Honor.

21              MR. HENEGHAN:   Good morning, Your

22   Honor.  My name is Tom Heneghan.  I'm here on

23   behalf of Aurobindo Pharma Limited and Aurobindo

24   USA.  With me is my partner, Jeff Ward, and
```

1   Richard Kirk from the Bayard firm.

2              The defendants have coordinated

3   our arguments where we have similar motions, so

4   we're prepared to address that.

5              THE COURT:   Tell me what you

6   would like to do in terms of coordination, and

7   then we'll have everyone else introduce

8   themselves.

9              MR. HENEGHAN:   There are two

10  motions that deal with personal jurisdiction, so

11  obviously those particular parties will argue

12  those motions.   There is a motion in relation to

13  Count 2 and whether it's appropriate for

14  subject-matter jurisdiction and declaratory

15  judgment action, and that applies to four

16  different parties.   And defendants have agreed

17  that I'll argue that particular motion.

18              THE COURT:   That you will?

19              MR. HENEGHAN:   I will.

20              There is also a motion --

21  subject-matter jurisdiction -- as to Count 1 as

22  to two particular parties, the U.S. subsidiaries

23  of Aurobindo and the U.S. subsidiary of Apotex.

24  Mr. Breisblatt will address that argument, and I

6

```
 1    will follow up with any specific facts that

 2    apply to Aurobindo separately.  He will be the

 3    main arguer of that.

 4              THE COURT:   And on the two

 5    personal jurisdiction motions?

 6              MR. HENEGHAN:  Mr. Ward will

 7    address the Aurobindo motion, and Mr. Breisblatt

 8    will address the Apotex motion.  And I think

 9    that covers all of them because to my

10    understanding, the Parr matter was resolved.

11              THE COURT:  I believe that's

12    right.  Let's continue with the introductions,

13    and we'll continue.

14              MR. BREISBLATT:  Your Honor,

15    Robert Breisblatt from Katten Muchin on behalf

16    of Apotex, Inc.  And I do have to correct one

17    statement.  Apotex Corp. is not a U.S.

18    subsidiary.  It's a separately incorporated

19    corporation, and I represent both Apotex, Inc.

20    and Apotex Corp.

21              MR. MADDOX:  Good morning, Your

22    Honor.  Steven Maddox from Foley and Lardner for

23    Cobalt.  This is my colleague, Jeremy Edwards.

24    We have only pending a motion to dismiss the
```

```
1    declaratory judgment claim with reference to
2    Aurobindo for primary argument.  If we feel we
3    need to add something, Mr. Edwards will speak.
4              MR. HORWITZ:  Good morning, Your
5    Honor.  Richard Horwitz from Potter Anderson,
6    and I am co-counsel with Mr. Breisblatt for
7    Apotex and with Mr. Edwards for Cobalt.
8              MR. HSU:  Good morning, Your
9    Honor.  John Hsu for Sun Pharmaceuticals.  We're
10   in the same position as Cobalt, and we'll defer
11   to Mr. Heneghan's argument.  We'll add anything
12   if we feel it necessary.
13             MR. SEAMAN:  Good morning, Your
14   Honor.  John Seaman.  I'm from Abrams and
15   Laster, Delaware counsel with Mr. Hsu.
16             MS. MATTERER:  Good morning, Your
17   Honor.  I'm Mary Matterer from Morris James
18   representing Mylan today with Eric Hunt from the
19   law firm of Rakoczy, Molino, Mazzochi, and
20   Siwick.
21             MR. BLOW:  Good morning, Your
22   Honor.  Edward Blow of the Cohen Matani firm.
23   We represent Sandoz.  Sandoz is not a party to
24   any of the motions today.
```

```
 1              MS. GONEGAL:  Good morning, Your

 2     Honor.  Patricia Gonegal with Sytes, Contract,

 3     and Green, local counsel to Sandoz.

 4              MR. KIRK:  Good morning, Your

 5     Honor.  Richard Kirk from Bayard, P.A.  I'm

 6     local counsel for Aurobindo, and Mr. Heneghan

 7     and Mr. Ward are my co-counsel.

 8              THE COURT:   I think that's

 9     everyone.  Mr. Lipsey, what is your

10     recommendation as to how we should proceed?

11              MR. LIPSEY:  I was thinking

12     through how to handle this amalgam of motions

13     we've got.  There is some heavy overlap, in that

14     some issues are raised in one motion that are

15     similar to issues raised in a different part of

16     a different motion.

17              It struck me that ultimately it

18     was incumbent on the plaintiffs here to explain

19     to the Court why it is that we feel that the

20     various claims we brought are appropriately

21     before the Court.  I was going to suggest that I

22     take a stab at summarizing those points for the

23     Court.  Anybody who feels that I'm wrong can

24     stand up and explain to the Court why they feel
```

1    I'm wrong.

2                    I was going to propose to start

3    with the less evidentiarily complex motions,

4    the Count 2 issue and then the 271(e) issue on

5    the U.S. corporations, and then proceed to the

6    personal jurisdiction motions, which are much

7    more complex.  And I could handle those either

8    all together, or I could handle them piece-wise.

9                    It seems to me it might make

10   sense, given the way it's going to be argued, if

11   I explain why Count 2 is properly in the case,

12   and why the U.S. corporations are appropriate

13   parties to the 271(e)(2) count -- and we have a

14   responsive argument on that -- and then move to

15   the jurisdiction motions, if that is

16   satisfactory to the Court.

17                    THE COURT:   Have you conferred

18   with defense counsel on that?

19                    MR. LIPSEY:  I have not.  This

20   came to me in the middle of the night.

21                    THE COURT:   I'm sure they

22   appreciate you not calling them then.  Can you

23   folks on that side tell me how you feel about

24   that?

1              MR. BREISBLATT:  Your Honor, it

2    seems to me though it's a generous offer by Mr.

3    Lipsey that the defendants in this case are the

4    ones that filed the motions, and normally in

5    motion practice we should go first.  And my

6    suggestion would be the first argument we do

7    have an agreement on is -- it should be on the

8    declaratory judgment action -- which is Count 2,

9    and we should lead with that.  Then Mr. Lipsey

10   can respond, and we would have our reply, and

11   that would be tendered to the Court.

12              And then the next step would be

13   the kind of overlapping on the Delaware

14   corporations and an argument as to why there is

15   no subject-matter jurisdiction.  And then

16   finally it seems to me, because those parties

17   who don't have a stake in it could leave if they

18   so chose, the jurisdictional arguments would be

19   the last ones.

20              THE COURT:  The two personal

21   jurisdiction arguments.

22              Well, I think, notwithstanding the

23   insight you had in the middle of the night, I'm

24   going to stick to the more standard practice.

1    And we'll deal first with -- the issues are

2    basically the same order that you proposed in

3    any event, but you'll get a chance to stand up

4    several more times.

5                    We'll hear first on the Count 2

6    issue.  We'll hear from the defense and then

7    plaintiff response and brief rebuttal if

8    necessary from the defense, and then move to the

9    Count 1 issue, and then the personal

10   jurisdiction questions.

11                   MR. HENEGHAN:  Thank you, Your

12   Honor.  Tom Heneghan on behalf of Aurobindo

13   Pharma Limited and Aurobindo USA.  We first

14   discussed our motion to dismiss Count 2 of the

15   plaintiff's complaint based upon subject-matter

16   jurisdiction.

17                   Count 2 is what I would call a

18   garden-variety declaratory-judgment action

19   alleging that Aurobindo Pharma is going to

20   infringe AstraZeneca's patent in the future.

21   And in order for that claim to have

22   subject-matter jurisdiction, there has to be an

23   actual controversy.  It has to be sufficiently

24   immediate to justify jurisdiction under 271(a).

1     In this case, those facts just aren't here.

2                    The most interesting part about

3     this approach is that under 271(e), there's a

4     safe harbor for the kind of conduct that the

5     defendants here have engaged in in preparing

6     their abbreviated new drug application for

7     submission to the FDA.  If that safe harbor can

8     be eviscerated by a declaratory judgment action,

9     there isn't much point in even having it.

10                    So what we have here is we have a

11    very unique jurisdictional situation with the

12    claims under the Hatch-Waxman Act in Count 1

13    which are appropriate jurisdictionally in that

14    regard.  But then we have this tack-on 271(a)

15    claim, which just simply does not have

16    declaratory judgment jurisdiction.

17                    THE COURT:   Does safe harbor go

18    to immunity from liability or immunity from

19    suit?

20                    MR. HENEGHAN:  It goes to immunity

21    from suit, Your Honor.  If it weren't for the

22    ability to sue us under the Hatch-Waxman Act for

23    the filing of our application for that

24    artificial act of infringement, there's no

```
 1     question they couldn't bring this declaratory

 2     judgment action.  So they have --

 3                  THE COURT:  Why is that?  Where

 4     would their declaratory judgment act, 271(a),

 5     fall short?  That is, you're prepared to go to

 6     market, you've done some research, you're ready

 7     to go forward.  Where would they fall short on

 8     their 271(a)?

 9                  MR. HENEGHAN:  On precisely those

10     facts.  We are not ready to go to market.  We

11     are waiting for FDA approval, FDA approval that

12     will not come for at least two to three more

13     years.  The problem here is really the immediacy

14     of the situation.  We could not take our drug to

15     market tomorrow because we don't have FDA

16     approval.  The FDA approval is currently stayed

17     by the Hatch-Waxman Act.

18                  THE COURT:  That's what it is,

19     isn't it?  It's the thirty-month stay that is

20     the only thing that stands between them and the

21     ability to bring the 271(a) action.

22                  MR. HENEGHAN:  The thirty-month

23     stay and FDA approval, which are related but not

24     the same.  We could not bring this drug to
```

14

```
 1    market tomorrow because we don't have FDA
 2    approval.  FDA approval is not automatic.
 3    There's a process involved, and no one is close
 4    to having approval from the FDA even without the
 5    stay.
 6              So really what we have is this
 7    future possible activity that is a long way from
 8    being right, and that's why the Count 2
 9    jurisdiction just doesn't exist yet.
10              THE COURT:  Is the situation in
11    your view at all analogous to Medimmune?  The
12    facts there, as I recall, were you had a
13    licensee that was continuing to pay royalties
14    but under protest.  And the Federal Circuit, I
15    think, had an issue, dismissed the declaratory
16    judgment lawsuit by the licensee, saying, "There
17    isn't sufficient immediacy in the case and no
18    controversy because you're continuing to pay the
19    royalties, so how can they oversee you?"
20              But of course, we all know the
21    Supreme Court reversed that, arguably on the
22    grounds that the only thing that was stopping
23    there from being jurisdiction in that context
24    was an action of the licensee.  That is, paying
```

```
 1        the royalty under protest.

 2                    Why is it not entirely analogous

 3        here that the only thing that is preventing

 4        AstraZeneca from pursuing 271(a) is their action

 5        of filing the Hatch-Waxman and triggering the

 6        thirty-month stay?  Why isn't that entirely

 7        analogous to what the Supreme Court said there

 8        is declaratory judgment on?

 9                    MR. HENEGHAN:  Because the

10        difference is that there is, for lack of a

11        better word, third party involved here, and

12        that's the FDA.  Unlike Medimmune where

13        Medimmune's situation was in their control, they

14        made a choice about the licensing fee and set

15        that up.

16                    In our case, we have no control

17        over when the FDA approves our application.  The

18        only thing -- the only force that is being

19        applied now is the stay.  Even without the stay,

20        we would not have FDA approval any time in the

21        near future.  The approval process takes a

22        period of time.  It's an administrative process,

23        and we're not in a situation where we have any

24        control or AstraZeneca has any control over
```

```
 1    whether or not the actual infringement can

 2    occur.

 3                   Remember, there's no actual

 4    infringement here.  All we have is this

 5    artificial act of infringement that's created by

 6    the Hatch-Waxman Act.

 7                   THE COURT:  One of the parties,

 8    though, said -- I think it was Cobalt -- that if

 9    AstraZeneca waived, for lack of better word, the

10    thirty-month stay, I should go forward with

11    Count 2.  It sounds like that's not your

12    position.  Your position is even if the

13    thirty-month stay didn't exist or they

14    voluntarily said we don't want it, you would

15    still be trying to dismiss Count 2.

16                   MR. HENEGHAN: I guess my response

17    to the Cobalt argument was, that's an

18    interesting idea.  I think it is highly unlikely

19    that AstraZeneca would ever agree to waive that

20    stay.  If they are willing to waive that stay,

21    we are certainly willing to consider it.  But I

22    think that's just not something that's going to

23    happen.  I think it's an interesting argument.

24                   But the bottom line is we don't
```

```
 1        have the immediacy.  We don't have the ability

 2        to actually commit an act of infringement, and

 3        under 271(a), there has to be an actual act of

 4        infringement, not just this artificial act

 5        indentified by 271(e).

 6                   And we have 271(e) jurisdiction.

 7        The issues are before the Court properly with

 8        proper subject-matter jurisdiction, and that is

 9        what distinguishes Count 1 from Count 2.

10                   Did you have another question,

11        Your Honor?

12                   THE COURT:   If the 271(a) is not

13        timely now, at what point -- in your view --

14        would it be timely?  When there is a pending

15        Hatch-Waxman 271(e)?

16                   MR. HENEGHAN:  I guess it could

17        become -- it could ripen if you had a situation

18        where the thirty-month stay had expired and FDA

19        approval had been granted and there was an

20        ability for the defendants to actually launch

21        their product.  But the issues related to the

22        271(e) case have not yet been resolved, except

23        the issues are the same.

24                   So we're really talking about a
```

```
 1      redundancy here in this claim.  The issues in

 2      the 271(e) case, infringement and validity, are

 3      going to resolve the issues that exist in the

 4      271(a) case on the same patent.

 5                 THE COURT:  You're not concerned

 6      that if the court order rules that you can't do

 7      what AstraZeneca is doing, that that could lead

 8      to protracted litigation, which I know

 9      Hatch-Waxman is trying to prevent?  That is,

10      where someone in AstraZeneca's position, not

11      being able to do 271(a) at the same time as E,

12      will do the E, get as much mileage and delay out

13      of that as they can, and then hit you for an A.

14      You're not concerned with that?

15                 MR. HENEGHAN:  I'm not concerned

16      with that, Your Honor, because the ability to

17      have all the issues resolved during the 271(e)

18      case really resides with us, too, as long as we

19      raise the issues of invalidity that need to be

20      raised.  As long as we defend the issues that

21      AstraZeneca raises, then there would be a

22      resolution on the issues that will relate to a

23      future 271(e) case.  So they're not going to

24      have the opportunity to piggy-back the second
```

```
 1    case.

 2                     THE COURT:   Okay.  Thank you.

 3                     Mr. Lipsey, your first chance.

 4                     MR. LIPSEY:  Thank you, Your

 5    Honor.

 6                     The question of the viability or

 7    propriety of Count 2, the count for a

 8    declaratory judgment of threatened future

 9    infringement under 271(a), is really fully

10    answered by the Glaxo v. Novapharm opinion which

11    we cited in our brief.

12                     Just to address some of Mr.

13    Heneghan's points right off the bat, because it

14    is an action for threatened future infringement,

15    it does not require an actual act of 271(a)

16    infringement in order to be a legitimate claim.

17                     The Glaxo Court made it clear that

18    that sort of declaratory judgment action looks

19    to the time after the drug has been approved, is

20    perfectly appropriate under traditional patent

21    jurisprudence, and perfectly appropriately made

22    in a case where there is a 271(e)(2) claim --

23    admittedly on other patents -- and perfectly

24    appropriate notwithstanding that the activity
```

1    that created the threat of future infringement

2    was itself protected by the safe harbor of

3    271(e)(1).

4              Those were exactly the facts in

5    Glaxo v. Novapharm.  It was exactly this

6    situation.  There was a notice letter, there was

7    a suit, there was a suit on some patents under

8    271(e)(2) for the filing of the ANDA, there was

9    a declaratory judgment count on there for

10   threatened future infringement, and the Court

11   found that to be a perfectly appropriate claim

12   to be joined in that case.

13             THE COURT:  I think, though, in

14   that case some of the alleged infringing

15   activity was not within the safe harbor; is that

16   correct?

17             MR. LIPSEY:  No, that is not

18   correct, and that's one of the things in their

19   reply briefs that's dead wrong.

20             The alleged act of infringement

21   was under 271(g) which is the so-called process

22   patent bill, that importation into the United

23   States of a product made by a patented process

24   is an act of infringement, just as making,

```
 1     using, and selling is an act of infringement

 2     under 271(a).

 3               The safe harbor under 271(e)(1)

 4     applies to both of those.  The activity of

 5     importing it for the purposes of getting FDA

 6     approval, if that had been an act of

 7     infringment, there would have been no need for a

 8     declaratory judgment action.  There would have

 9     been straight infringement action.  That's a

10     critical error in their analysis of Glaxo v.

11     Novapharm.

12               There's certainly no statute case

13     or anything that they've cited or that I'm aware

14     of that says you cannot bring a declaratory

15     judgment action for threatened future

16     infringement if you also bring a 271(a)(2)

17     action for filing the ANDA.  Indeed, one of the

18     cases they cite, Abbott v. Zenith, declined to

19     allow the declaratory judgment action where you

20     could not bring the 271(e)(2) claim.  So it

21     seems perfectly appropriate to join the two

22     together.

23               THE COURT:  It is a little odd

24     when you acknowledge Congress went to the
```

1          trouble of setting up this matter of 271(e)

2          process.  It seems odd that they would go to

3          that much trouble if you could just do 271(a).

4                      MR. LIPSEY:  The point is -- and

5          this is actually my final point -- why bother?

6          Which is, I'm sure, the question.  Why bother?

7                      The 271(a) declaratory judgment

8          count clearly binds the U.S. corporations, these

9          Delaware corporations that are the sales and

10         marketing arms of these foreign companies -- who

11         are the ones, after all, who are actually going

12         to be marketing the product -- they are the ones

13         who are threatening to infringe under 271(a).

14         And it is contended -- we'll hear lots of

15         argument in a minute -- it is contended that

16         they are not proper parties to the other

17         infringement count, the 271(e)(2).

18                      And we're dealing here with a

19         question of patent certainty.  There are

20         provisions that allow them patent certainty.

21         They can bring declaratory judgment actions on

22         patents we don't sue on.  It's appropriate for

23         us to have patent certainty as well, and that

24         is, that if we are going to litigate these

```
1    issues, that everybody who is involved in the

2    transaction is ultimately bound by the outcome.

3                   That's why it's important to have

4    that count in here, and to have it in here now.

5                   THE COURT:  I think what you're

6    saying is -- I think Congress thought they were

7    creating a method for patent certainty when they

8    adopted Hatch-Waxman, but you're saying at least

9    in the circumstances here, that goal would not

10   be served by limiting your 271(e) remedy.

11                  MR. LIPSEY:  Where the ANDA

12   applicant and the party that is going to be

13   committing the acts of infringement is the same,

14   as is the case with a normal U.S. corporation,

15   that's probably correct.  It's probably correct

16   that the remedy under 271(e)(2) would be

17   absolutely adequate.

18                  Where you have this divided

19   situation where the ANDA owner is a foreign

20   company and claims it's not going to be selling,

21   and you have a U.S. domestic company that's

22   going to be selling, and it's contended they're

23   not a proper party to the infringement action,

24   that's where you really need to have it, and
```

1    that's why it's here in this case.

2                    Thank you, Your Honor.

3                    THE COURT:    Thank you.

4                    MR. HENEGHAN:    Your Honor,  I'll

5    be brief.  I just want to address a couple of

6    things that Mr. Lipsey mentioned.

7                    First, the Glaxo/Novapharm case is

8    a very, very different kettle of fish.  As

9    Mr. Lipsey correctly pointed out, that claim

10   involved a method of making patents that is

11   specifically outside of 271(e).  It's a claim

12   under 271(g), and 271(e)(2) specifically says,

13   and the Glaxo court specifically found, that

14   271(e)(2) does not provide jurisdiction to hear

15   infringement cases regarding claims directed to

16   methods for making drugs.  So there isn't a

17   271(e) claim that could have covered what the

18   Glaxo court was talking about, this 271(g)

19   claim.

20                    It's a very, very different

21   factual and procedural situation in that case

22   because it was a 271(g) case.  This is not a

23   271(g) case, and to try to shoehorn the facts

24   here into that Glaxo case, I think, is just

```
 1    plain wrong.
 2                 THE COURT:   Let me ask you,
 3    though, there is some language at a minimum in
 4    Glaxo that is very helpful to plaintiffs.  I
 5    want to make sure I have your position on that.
 6                 For instance, on page 1569, the
 7    Federal Circuit said, "271(e)(2) provided
 8    patentees with a defined act of infringement
 9    sufficient to create a case of controversy
10    jurisdiction to enable the Court to promptly
11    resolve any dispute concerning infringement and
12    validity."
13                 So the question, obviously, is why
14    is it the Federal Circuit's declaration there in
15    that sentence of "promptly resolve any dispute
16    relating to infringement and validity"?  Why
17    doesn't that encompass a 271(a) in this context?
18                 MR. HENEGHAN:  The reason, Your
19    Honor, is because in that particular situation
20    we had a group of patents, and not all of them
21    were listed in the Orange Book; therefore, not
22    really contemplated within the Hatch-Waxman Act.
23    So Glaxo brought suit only on one Orange Book
24    patent.
```

1          And there was this method of

2    making patent outside the Orange Book, but that

3    was related to this process.  In that case, the

4    Glaxo Court identified that for the purpose of

5    getting all these issues resolved, it made sense

6    under 271(g) to allow that patent to be brought

7    in.

8          Here we don't have that situation.

9    The patents at issue are all in front of the

10    Court already under 271(e) action.  There is no

11    tag-along patent that ought to also be resolved

12    in order to bring all these others to a head in

13    this case.

14          In fact, Mr. Lipsey's stated

15    reason of "why bother" I think tells us a lot

16    here.  Essentially what they're trying to do is

17    assert jurisdiction over companies they would

18    not otherwise have jurisdiction over under the

19    Hatch-Waxman Act in order to try to get more

20    protection than they're entitled to.  Their

21    concern seems to be that three years from now

22    these U.S. companies might illegally sell some

23    drugs that might infringe their patent.  I don't

24    think that can be a basis for declaratory

1    judgment jurisdiction.

2              First of all, there are no facts

3    to support that.  If AstraZeneca were to win

4    this case, their patent was upheld, and the

5    defendants were found to infringe, no U.S. drug

6    company would have the ability to get FDA

7    approval to sell.  There could be no future act

8    of infringement because, again, you come back to

9    you can't sell these drugs without FDA approval.

10             There's no way, for example, if

11   you want to talk about Aurobindo USA as one of

12   the U.S. marketing arms, there's no way for

13   Aurobindo USA to sell this drug without FDA

14   approval, unless they want to do it illegally.

15   And to suggest that jurisdiction lies in what a

16   company might do illegally three years from now

17   with no facts to support that I think doesn't

18   carry weight.

19             THE COURT:   Before you sit down,

20   there are four defendants that have moved to

21   dismiss Count 2.  But if I'm not mistaken, I

22   think Count 2 is asserted against all seven.  So

23   if it's jurisdictional, even though three of

24   them didn't bother to move, I assume that if I

 1    agree, I'm going to dismiss for all of them?

 2                    MR. HENEGHAN:  That would be my

 3    assumption as well, Your Honor.  I don't know if

 4    Mr. Lipsey agrees with that.

 5                    MR. LIPSEY:  I would like to

 6    address that as follows:  Which is, we are not

 7    the ones who are making up the dilemma here.

 8    It's addressed in one of the Lupin cases which

 9    is Aventis v. Lupin case.  There's a footnote at

10    the end which I think the Court may have seen.

11                    "This is what is known as a

12    'heads, I win; tails, you lose' situation.  If

13    Lupin Limited" -- which was the Indian company

14    -- "prevails in this suit, the dismissal of its

15    subsidiary" -- the U.S. subsidiary -- "is of no

16    consequence.  Marketing the drug may proceed

17    with no problem.  If Lupin Limited" -- the

18    Indian company -- "loses the suit, the dismissal

19    of its subsidiary allows that subsidiary to

20    proceed anew."

21                    That's why we need it in this

22    case.  I would agree that if there is no

23    jurisdiction to entertain in one of the cases --

24    I would distinguish the situation where there is

1        this division of responsibility.  Certainly if

2        the Court were to find that there's no

3        jurisdiction even in the case where there is a

4        foreign company that owns the ANDA and a U.S.

5        company that's going to market it, that we

6        should probably dismiss that case.

7                    THE COURT:    Thank you.

8                    Mr. Heneghan, did you or any of

9        the other defendants have anything more to say

10       with respect to the Count 2 issues?

11                   MR. MADDOX:  May it please the

12       Court, Steve Maddox for Cobalt.  Not to cite new

13       cases for you here, but just to examine briefly.

14                   The first time we were here --

15       there's a clear reason why this extra count is

16       in there.  We've got a situation where what

17       we're hearing is you need this declaratory

18       judgment count.  We need this as plaintiffs

19       because the people who filed the ANDAs that are

20       at issue here might have friends and might have

21       subsidiaries -- do have some subsidiaries --

22       that if they lose, these subsidiaries might

23       start down a regulatory path again.

24                   Frankly, it seems to me it's the

```
 1       Court's job to deal with those who are seeking

 2       approval for their products and not to worry or

 3       attempt to adjudicate all those who, starting

 4       three or four years from now, might decide to

 5       proceed, even apparently in the face of an

 6       adverse judgment on patents.  It seems to me

 7       more like this was thrown in for good measure,

 8       and now, we're desperately seeking for some

 9       reason.

10              The second thing I'd like to

11       emphasize, it got discussed very quickly up

12       front.  Congress said there are some things that

13       shall not be infringed upon because we have

14       reasons for not wanting the infringement.  Work

15       you do in preparation for an FDA submission.  If

16       you let these claims stay, it will be Congress

17       said these things are not infringement, but the

18       Court said if you put the words declaratory

19       judgment in front of them, it can be

20       infringement that you litigate.  It seems to me

21       that would be a flat-out reversal of Congress.

22              Thank you.

23              THE COURT:  Before I give you a

24       chance to respond if you want to, anybody else
```

1     on Count 2?

2               MR. BREISBLATT:  I don't mean to

3     be repetitious.  I'm going to focus on one of

4     the things Court noted.

5               This is a legislative scheme set

6     up by Congress with a very specific intent and

7     purpose.  Every Court that's dealt with it

8     refers to the suits under 271(e) to be artifical

9     acts of infringement.  That's exactly what they

10    were.  They were created for a specific purpose.

11              The DJ action has no place in

12    here.  If, in fact, the parties who filed the

13    ANDA are held to infringe, one of the remedies

14    is an order that goes to the FDA prohibiting

15    approval of their ANDA.  If that ANDA is not

16    approved, they can't sell the drug through any

17    party.  That will stop it, period.  There's no

18    reason for a DJ action.

19              THE COURT:  Thank you.  That's it

20    from the defense on Count 2?

21              MR. HSU:  John Hsu.  We have

22    nothing further.

23              MR. HENEGHAN:  I think that's all

24    of us.

```
 1                    THE COURT:  Did you want to

 2     respond?

 3                    MR. LIPSEY:  I think we fully

 4     briefed it, and I don't think our position

 5     improves with repetition, Your Honor.

 6                    THE COURT:   Let's turn the page

 7     from Count 2, then, and we'll move to the

 8     arguments of Aurobindo and Apotex on Count 1 and

 9     start with the defense.

10                    MR. HENEGHAN:  I think

11     Mr. Breisblatt will address that one, Your

12     Honor.

13                    MR. BREISBLATT:  Your Honor, it is

14     kind of the follow-through, and that is Apotex

15     Corp. is a company whose main headquarters is in

16     western Florida.  It's a Delaware corporation.

17     It is not the entity that has prepared the ANDA.

18     Under the regulations, one is required to list

19     an organization that is in the United States for

20     receipt of service so that there's someone in

21     the United States that can receive information

22     if need be.

23                    That is the role that Apotex Corp

24     follows on the ANDA.  It is listed solely as the
```

33

```
 1      agent for purposes of those communications on

 2      the ANDA, but it does not have a stake.  It is

 3      not the one who filed the ANDA.  That is Apotex,

 4      Inc.  Apotex, Inc. would be the manufacturer of

 5      any products should it receive FDA approval.

 6      Therefore, there is no subject-matter

 7      jurisdiction over Apotex Corp.  And I think

 8      Aurobindo is in the same situation.

 9                There happens to be an entity,

10      Aurobindo, who is a domestic corporation who is

11      listed on the ANDA solely as an agent for those

12      purposes.  Therefore, under the Hatch-Waxman

13      statute, they are not the filer of it.

14      Therefore, they are not subject to the suit.

15      It's a very simple argument.

16                THE COURT:   Is this a 12(b)(6) or

17      a 12(b)(1) motion?

18                MR. BREISBLATT:  It's both.  It's

19      a 12(b)(1) because there's no subject-matter

20      jurisdiction over them under the Hatch-Waxman

21      statute, and there is no claim for which relief

22      can be granted for that very basic reason.

23      They're not the proponent of this artificial act

24      of infringement.  They weren't the filer of the
```

1    ANDA.

2                 THE COURT:   Is that standard, the

3    legal standard, not important because, for

4    instance, AstraZeneca makes allegations that the

5    American entities were involved in the

6    preparation of the ANDA?  But you're telling me

7    and put in evidence that arguably indicates that

8    they weren't involved.  How do I, in this

9    procedural stage, address a dispute like that?

10                MR. BREISBLATT:  The only evidence

11   that has been put in and the only thing they

12   concede and the only thing they can concede is

13   that they are listed as a U.S. agent for

14   purposes of it.  There is absolutely -- we've

15   put in affidavits and they haven't replied to

16   them -- that the ANDA was prepared in our case

17   in Canada.  That's where the product will be

18   manufactured.  They have not in the least bit

19   disputed that.

20                So the only issue is simply

21   listing the U.S. entity as agent for purposes of

22   this ANDA sufficient to create subject-matter

23   jurisdiction, and we say under the Hatch-Waxman

24   provisions it is not, and therefore, there is a

```
 1        failure to state cause of action.
 2                    THE COURT:    Two courts -- I
 3        believe only two courts have addressed this, and
 4        they both disagreed with your position.
 5                    MR. BREISBLATT:    I think the
 6        Courts that have looked at it -- and it depends
 7        on the situation.  My recollection is those were
 8        wholly-owned subsidiaries, if I'm not mistaken,
 9        of the company that was putting it out.  They
10        weren't independent companies as Apotex Corp.
11        is.
12                    I think that's the major
13        distinction.  Apotex Corp. is an independent
14        company.  It is not part of Apotex, Inc.  It's
15        not simply a U.S. subsidiary.  It's an
16        independent corporation whose sole tie to this
17        ANDA at this point in time is it is listed as
18        agent.  If the ANDA is approved down the road,
19        they will more likely than not be the entity
20        that sells the product.  But again, it is a
21        separate U.S. corporation.
22                    THE COURT:    They also, though,
23        even just as agent, as I understand it, by
24        signing the application, they're making certain
```

```
 1      certifications such that the application

 2      contains true statements.  They're making a

 3      promise to supplement it.  Isn't that an act of

 4      some significance in this context?

 5                  MR. BREISBLATT:  Not in terms of

 6      being the owner of the ANDA.  In fact, what

 7      they're listed as is the authorized U.S. agent,

 8      and they do list Apotex Corp.  And then under

 9      the certification, they do sign that they will

10      do that, but it is understood that they will do

11      it as the agent for the entity that is actually

12      listed on the front page as the applicant.  And

13      the entity that is listed as the applicant is

14      Apotex, Inc.

15                  And the FDA wants somebody in the

16      United States if the applicant is not to sign,

17      and that's the purpose of the agent in this

18      case.  That does not mean they are the

19      applicant.  Remember, it is only the applicant

20      who files the ANDA who becomes the -- or does

21      the artificial act of infringement.  The act of

22      infringement here is the filing of the ANDA, the

23      artificial act of infringement.

24                  THE COURT:   It's the party who
```

```
 1    submits the application who is committing the

 2    artificial act of infringement; is that right?

 3                    MR. BREISBLATT:  I would argue

 4    it's the party that prepares and owns the

 5    application.  The applicant is the only one who

 6    is actually committing the artificial act of

 7    infringement.

 8                    THE COURT:  What would you cite

 9    for that argument?

10                    MR. BREISBLATT:  Well, just look

11    at the application.  The applicant is listed,

12    and they give their address, and the statute

13    says the artificial act of infringement is

14    filing the ANDA.  That would tend to lead the

15    person who prepares it, the applicant, is the

16    one who does it.

17                    THE COURT:  Okay. Is that all you

18    have?

19                    MR. BREISBLATT:  That's what I've

20    got, Your Honor.

21                    THE COURT:  Are you speaking for

22    Aurobindo on this one?

23                    MR. HENEGHAN:  Your Honor, I have

24    a couple things to add.
```

```
 1                  Mr. Breisblatt is correct that

 2        there are some great similarities between

 3        Aurobindo's situation and Apotex's situation.

 4        Really what this comes down to is, who submitted

 5        this application?  Who did the work?  Who's

 6        going to benefit from the application?  Who is

 7        the party who understands the technology, can

 8        make the drug, is going to provide the drug to

 9        the U.S. market?  And that, in this case, is the

10        applicant.  In our case, Aurobindo Pharma

11        Limited, which is an Indian corporation.

12                  Aurobindo USA, which is a separate

13        corporate entity, signed the application only as

14        the U.S. agent, and only because it's required

15        by law to have -- when you have a foreign

16        corporation filing an application -- to have a

17        U.S. agent so that the FDA has a way of

18        contacting and passing through information to

19        the foreign entity.

20                  When we talk about the obligation

21        to supplement, I would say it's no different

22        than the obligation we as attorneys have to

23        supplement Discovery Rule 26.  We're not

24        actually providing the information.  We are a
```

1    conduit for the information to the other side or

2    to the Court.  We have that obligation to

3    supplement.  It's not our information.  It's the

4    information of the party for which we are an

5    agent.  In this context in Court, in the context

6    of an application to the FDA.

7                    THE COURT:  Can you cite any case

8    or anywhere in the statute that I could rely on

9    to accept your argument that the cosigner is

10   merely a conduit, merely a mailbox, merely there

11   for service process?

12                    MR. HENEGHAN:  Your Honor, there

13   isn't any language one way or another which

14   answers that question.  But I think if you look

15   at what the application process is, to hold

16   otherwise would assume that this agent

17   understands all the technology involved in this

18   ANDA application, they understand the

19   formulation, they understand the organic

20   chemistry involved, they understand all the

21   other aspects.

22                    And that's really not what that

23   role is.  That role is to have an identity in

24   the U.S. that can be contacted more easily than

```
 1        the foreign corporation.  But for the

 2        requirement to have that kind of agency, there

 3        wouldn't be a signature from the agent.  The

 4        information is possessed, has been generated, it

 5        is in the control of the foreign corporation.

 6        They're the ones who know.  They're the ones who

 7        have done the work.

 8                    That's why it doesn't make sense

 9        to hold the agent accountable, any more than --

10        if I had signed as the U.S. agent in my role as

11        attorney, under the plaintiff's theory, I would

12        then be a defendant in this case as well.  I

13        think we can see that would be a bit ridiculous.

14                    The other thing I wanted to answer

15        was your question about 12(b)(1).  Our belief is

16        this is a 12(b)(1) motion.  I think the

17        plaintiffs would like to convert it to a

18        12(b)(6) because they would like to avoid the,

19        sort of, neutral evaluation of a jurisdictional

20        pass that comes with a 12(b)(1) motion.  They

21        would like the facts viewed in a light more

22        favorable to a nonmoving party.  That's not what

23        happens in a 12(b)(1) motion.

24                    There has been jurisdictional
```

1    discovery.  We've been very cooperative and

2    provided them with everything they asked for.

3    We provided them with two depositions, and they

4    haven't brought forth any facts to demonstrate

5    that Aurobindo USA was anything other than the

6    agent for the ministerial purpose of signing the

7    application.

8              THE COURT:   In terms of the

9    corporate relationship, do I have the same

10   issues before me on the Apotex as the Aurobindo?

11   That is, your relationship to the Aurobindo

12   entities is the same as the relationship of the

13   Apotex entities?

14             MR. HENEGHAN:  I'm not sure how to

15   answer that because I'm not sure I understand

16   what the Apotex relationship is.  But I can tell

17   you that Aurobindo USA is a subsidiary of

18   Aurobindo Pharma Limited, but it's a separate

19   corporate entity incorporated in the United

20   States.  It has a separate Board of Directors,

21   has separate officers.

22             There are some directors of one

23   who are officers of the other, or some officers

24   of one who are directors of the other.  But

```
 1          there are no common directors and no common

 2          officers at the same time, if that makes sense.

 3                          THE COURT:    That does.   Thank

 4          you.

 5                          Mr. Lipsey?

 6                          MR. LIPSEY:   I detect from the

 7          Court's questions that the Court has read our

 8          brief and understands the essence of our

 9          position.

10                          THE COURT:    I can say yes to the

11          first one.

12                          MR. LIPSEY:   I will try not to

13          belabor the point.

14                          There are, indeed, two cases on

15          point, Wyeth v. Lupin and Aventis v. Lupin, both

16          of which hold under circumstances which are

17          fundamentally indistinguishable from this case,

18          that where you have two related companies, a

19          foreign company that makes the drug and the

20          domestic company that's going to sell it in the

21          United States, and they act together as one in

22          order to sell it, and one signs the ANDA on

23          behalf of the other, then both are submitters

24          under the meaning of the statute.
```

```
 1                THE COURT:  Unless I missed it,
 2      there wasn't a whole lot of statutory analysis
 3      in either of those cases that would tell me
 4      exactly why it is under the statute I should
 5      view the American agents as submitters.
 6                MR. LIPSEY:  Fair enough.  And we
 7      attempted to deal with that in our brief.
 8                The first point is, the statute
 9      doesn't say applicant.  The statute says submit.
10      And then the question becomes, can there be more
11      than one applicant?  And we cited the FDA
12      regulation that indicated that, indeed, the
13      owner and the submitter can be two separate
14      people.  And indeed, that's exactly what we have
15      here.
16                We also included with our
17      responsive materials what's called the form
18      FDA-356-H, which is the actual document that
19      accompanies the abbreviated new drug
20      application.  In both instances, you can see
21      there is one and only one signature on this
22      ANDA, and the company name on Apotex is Apotex
23      Corp. with a signature, and the company name on
24      the form for Aurobindo is Aurobindo Pharma
```

```
 1      U.S.A., and the Court is exactly correct.

 2                  And the piece of analysis that

 3      really is unstated in the Lupin decisions comes

 4      from the certifications that are made when that

 5      is filed.  And the Court is absolutely correct

 6      that the signer here agrees to update the

 7      application with new safety information, agrees

 8      to submit safety update reports, agrees to

 9      comply with all applicable laws and regulations

10      in applying for approved applications, agrees to

11      comply with labeling regulations, and most

12      importantly, states the data and information on

13      this submission have been reviewed and, "to the

14      best of my knowledge are certified to be true

15      and accurate," warning that any false statement

16      is a defense under Title 18 in the United States

17      Code.

18                  That's the only signature that

19      you're going to find.  That is the submitter of

20      these ANDAs here.  That's why it's more than a

21      mailbox.  If one were to grope for an analogy,

22      and this may not be particularly apt, this Court

23      has a rule.  It says you have to have associated

24      local counsel.  That local counsel is not a
```

1    mailbox.  When that local counsel signs a

2    pleading, that local counsel is taking

3    responsibility under Rule 11 to make sure that

4    pleading is correct.

5            And they're very much the same

6    obligations here, and the person who signs and

7    submits that ANDA is more than a mere mailbox.

8            THE COURT:  Your argument, then,

9    is it's really the fact that they signed it.  I

10   don't need to go beyond that and determine are

11   they intending to market the product, do they

12   have a corporate relationship with the

13   manufacturer?  It's once they sign that and make

14   that sort of relationship you alluded to,

15   they're on the hook.

16           MR. LIPSEY:  I believe that is

17   correct.  If one wanted to fit squarely under

18   the analysis in the Lupin cases, one would go

19   one step further and satsify those requirements.

20           The argument on Apotex is somewhat

21   artificial.  If you read the web site, you get

22   the impression that Apotex, Inc. is the head of

23   this group.  We're told now in discovery that in

24   fact there's a holding company that is actually

1    above both.

2              But the fact remains, and it was

3    clear from the jurisdictional discovery, that

4    Apotex, Inc. manufactures drug product for the

5    United States and Canada and has nothing to do

6    with it other than to transfer it to Apotex Corp

7    for sale in the United States.  That is the

8    relationship.  That is exactly the relationship

9    that was in the Lupin cases as well.

10              I also agree with the point that

11   this is really a 12(b)(6) motion.  It really was

12   treated as a 12(b)(6) motion in the Lupin cases

13   and probably should be here.  One of these

14   motions raises the issue of what happens if one

15   of the foreign companies is not amenable to suit

16   here.  Must the case be dismissed?  And we

17   contend the answer is an unambiguous no.

18              We have here two Delaware

19   corporations unambiguously amenable to suit here

20   who have signed and certified and acted in

21   concert in submission of an ANDA, which is a

22   technical act of infringement, who have also

23   indicated the intention as soon as they are

24   allowed to do it to sell the product, which

```
 1        would be a threatened act of infringement under

 2        271(a).

 3                    We're going to try all these

 4        issues here with at least five other defendants,

 5        and submit we should be entitled to try those

 6        issues against these Delaware defendants here

 7        together with those other five.

 8                    The issue then becomes, is it

 9        absolutely essential to have the foreign

10        companies here also?  And to that, we say the

11        answer is no.

12                    First, a judgment against the

13        actual marketer will suffice for our purposes.

14        That's what we're trying to prevent, and the

15        actual marketers are the Delaware corporations.

16                    Secondly, their interests are

17        completely aligned.  They are represented by the

18        same counsel.

19                    Thirdly, if either of the parents

20        wishes to help or participate involuntarily, or

21        even voluntarily appear, they certainly know how

22        do to that.  We've shown the Court that both

23        parties are involved in active litigation here

24        in this Court as we speak.
```

```
 1                    And lastly, the allegations made

 2         that there might be inconsistent judgments.

 3         That's just not so.  If we did have to try the

 4         case twice, if the patent's declared invalid in

 5         this Court and collaterally stopped in the other

 6         one, if it's declared invalid in the second

 7         court, they win either way.  So there's no risk

 8         of an inconsistent judgment.

 9                    That's it.  Thank you, Your Honor.

10                    THE COURT:    Thank you.

11                    MR. BREISBLATT:  I assume we're

12         still arguing on Apotex Corp.  And what I

13         thought I would do is I would draw the Court's

14         attention to the CFR because now the question

15         becomes -- we've looked at the document

16         Mr. Lipsey showed to the Court and that I

17         referred to, and that's the application form

18         which makes it quite clear that the only

19         applicant here is Apotex, Inc. and it has an

20         agent.  And the Court asked, rightfully so, why

21         do you need an agent?

22                    We do it because the CFR tells us

23         we have to.  This is on page three of our motion

24         to dismiss, but they're important.  Footnote 1
```

1    is 21 CFR, Section 314.52(c)(7)(c).  It states

2    that, "If the ANDA applicant does not reside or

3    have a place of business in the United States,

4    the applicant must provide the name and address

5    of an agent in the United States authorized to

6    accept service of process for the applicant."

7              So therefore, the name Apotex

8    Corp. Because Apotex, Inc. is a Canadian company

9    headquartered up in Toronto.

10             Then 21 CFR, Section 314.50(5)

11    states, "The applicant or the applicant's

12    attorney, agent, or other authorized official

13    shall sign the application.  If the person

14    signing the application does not reside or have

15    a place of business within the United States,

16    the application is required to contain the name

17    and address of, and be countersigned by, an

18    attorney, agent, or otherwise official who

19    resides or maintains a place of business within

20    the United States."

21             Having represented the Government

22    for a number of years before I went into private

23    practice, I know and the Court probably knows

24    that when they do forms, it doesn't always

1    follow the reg.  So if you look at form FDA 356

2    H4/06 page two of three, there isn't a place for

3    two signatures.  There's only room for one.  And

4    it says, "Signature of responsible official or

5    agent."

6              So the reg requires an agent to

7    sign it if the applicant doesn't reside in the

8    United States.  There's only one place on the

9    government form for a signature.  It calls for

10   the agent or responsible official, but since the

11   reg says it's got to be signed by, if you're not

12   a U.S. corporation, someone in the U.S., you

13   wind up with the signature of Apotex Corp.

14             And all of the material which we

15   supplied in discovery shows that everything for

16   this ANDA is going to be done by Apotex, Inc.

17   Apotex, Inc. is the only proper party, not

18   Apotex Corp.

19             To answer the Court's question,

20   the reg required an agent.  We have an agent.

21   The reg requires the agent to countersign.  The

22   form only has one place for one signature.

23             THE COURT:   Thank you.

24             MR. HENEGHAN:  Your Honor, just

1    again very briefly.  I think it's important to

2    note in the Lupin cases that Mr. Lipsey

3    addressed and the Court asked about that in that

4    case, the Court found that Lupin, the U.S.

5    subsidiary of Lupin, was actively involved in

6    the ANDA process.  That's the difference between

7    our situation and the Lupin situation.

8                I agree with you that in that

9    situation it appeared that the Court made a

10   determination that Lupin was a proper party.

11   The reason they made that decision is because

12   the Lupin U.S. subsidiary was actively involved

13   in the ANDA process.  We don't have that

14   situation here, and definitely not on behalf of

15   Aurobindo, and from what I can see of the

16   evidence, not on behalf of Apotex, either.

17               These U.S. entities merely signed

18   the application as they were required to do but

19   were not involved in gathering the  information,

20   doing the testing, getting the bio-equivalency

21   data, and all the rest that goes into the two:

22   Having the ANDA completed and submitting that to

23   the FDA.

24               THE COURT:   But we know that

```
 1          they're likely to be involved in marketing,

 2          don't we?

 3                    MR. HENEGHAN:  But, Judge, that

 4          gets into a little bit of what we talked about

 5          in Count 2, which is in order for them to be a

 6          proper party, then we're talking about something

 7          they might do in the future, and there just

 8          isn't subject-matter jurisdiction for that.

 9                    271(e) is very specific about who

10          is subject to jurisdiction on that artificial

11          act of infringement.  We don't have real

12          infringement here.  So what the U.S. subsidiary

13          or U.S. entity might do three years from now

14          upon approval is not what's before the Court.

15                    What's before the Court is this

16          artifical act of infringement created by the

17          Hatch-Waxman Act, and the Hatch-Waxman Act is

18          very clear about who is subject to jurisdiction

19          with that artificial act of infringement.  And

20          it's the person who submits the ANDA

21          application.

22                    In order to submit the ANDA

23          application, there's a tremendous amount of work

24          and data that has to be generated.  All of that
```

53

```
1    has been done by the foreign entities.  All the

2    U.S. company did was sign it, and I don't think

3    that it's possible on those facts to find that

4    they were actively involved in the way the Lupin

5    cases were actively involved.

6              THE COURT:   Thank you.   That

7    leaves us with just a couple of personal

8    jurisdiction matters; is that right?

9              Let's move on to those.

10             MR. BREISBLATT:   I was going to

11   suggest it be done alphabetically, but both

12   Aurobindo and Apotex start with an A.  So I'll

13   go first.

14             Your Honor, the jurisdictional

15   argument is a heavily -- and the personal

16   jurisdiction argument is -- the burden is on the

17   plaintiff to show that there's jurisdiction in

18   Delaware over Apotex, Inc., and they have failed

19   at that.  It was their burden to show it, and

20   there simply is no basis for it.

21             They're finally reduced to saying

22   that since Apotex, Inc. has been sued a number

23   of times and did not contest personal

24   jurisdiction, in other words, there was no
```

1    finding of it, somehow that creates

2    jurisdiction, and the cases don't support it in

3    Delaware.

4         The closest they can come to

5    making an argument that one of those pieces of

6    litigation somehow benefitted Apotex, and I

7    thought it was an imaginative argument, was the

8    Quinipil litigation argument.  And that was the

9    Apotex suit against Pfizer in 2003, which was a

10   DJ action brought in Delaware because this is

11   Pfizer's home.

12        And it was an attempt by Apotex to

13   cause the first filer, which was not Apotex's,

14   180 days to begin.  Pfizer successfully moved to

15   dismiss, and the District Court granted it based

16   on no subject-matter jurisdiction at that time.

17   It was pre-Medimmune.  Apotex appealed, and

18   Pfizer gave Apotex a covenant not to sue in

19   2005, and the appeal was dismissed.  So there's

20   no Court ruling whatsoever.

21        Two years later, Apotex goes to

22   market.  No connection to the litigation, yet

23   their argument is somehow that was Apotex using

24   litigation in Delaware to make money.  And it

```
 1        just doesn't work.

 2                    Also, I think their argument that

 3        somehow Apotex, Inc. is in the business of

 4        litigation is interesting, but, again, is of no

 5        avail.  Apotex is the one who gets sued because

 6        it files ANDAs.  That simply is the legislative

 7        regime of the Hatch-Waxman statute.

 8                    Apotex, Inc. has no context in

 9        this state.  It has no employees in the state.

10        Even the claim that it employs lawyers, they

11        tend to be local counsel.  Local counsel is

12        often hired, as in this case, by the outside

13        counsel for the entity, but not by the entity

14        itself.

15                    So, again, there simply is no

16        evidence, there was no evidence.  They've taken

17        jurisdictional discovery, and there still is no

18        evidence that Apotex, Inc. has any ties to the

19        State of Delaware.

20                    One thing I would note, in our

21        original motion we talked about transferring the

22        case down to the Middle District of Florida

23        because there was a case there that had been

24        brought involving a DJ action because that's
```

```
1        where AstraZeneca had a place of business

2        closest to where Apotex, Inc.'s agent, Apotex

3        Corp., is located.

4                   That case has now been MDLed, and

5        it's been sent up here.  Therefore, we obviously

6        withdraw that request, and we simply move that

7        the suit against Apotex, Inc. be dismissed.  And

8        AstraZeneca, if it wants, should go to the

9        Southern District of Florida where the agent for

10       Apotex Inc., resides, Apotex Corp., and bring,

11       if it so chooses, a suit against Apotex, Inc.

12       under the Hatch-Waxman statute.

13                  The MDL panel has already said

14       that that case will be treated as a tag along,

15       and it will be back up here, and there will be

16       no disruption of the flow of the case.  But at

17       least Apotex, Inc.'s finding of jurisdiction

18       will be preserved.  Apotex, Inc. simply is not

19       and should not be found to have personal

20       jurisdiction in Delaware.  That's our position.

21                  What the Court should do is

22       dismiss the case against Apotex, Inc. because

23       there is not personal jurisdiction for it here.

24       Let AstraZeneca, if it so choose, go down to the
```

```
1    Southern District of Florida where, in fact,

2    Apotex, Inc. has consented to jurisdiction for

3    the Hatch-Waxman suit on this ANDA.  Let it

4    bring suit down there.  It will be transferred

5    back up here, but at least Apotex, Inc. will be

6    up here under the MDL as opposed to some claim

7    of personal jurisdiction which doesn't exist

8    here.

9              That's basically our position.

10             THE COURT:  Thank you.  Are you

11   speaking on behalf of both personal

12   jurisdictions?

13             MR. HENEGHAN:  No, I'm speaking on

14   behalf of Aurobindo.  I just didn't know if you

15   wanted Mr. Lipsey to respond to the specific

16   facts as they are --

17             MR. LIPSEY:  I'll do whatever you

18   want.

19             THE COURT:  Let's just go on with

20   the argument.

21             MR. LIPSEY:  I'd like to deal with

22   that very last point first because it's perhaps

23   the most important point the Court has before

24   it.  And that is, I think the Court saw from the
```

1       pleadings we worked very hard where we saw any

2       possibility of challenge to jurisdiction to

3       bring what we call the protective suits to make

4       sure that there was no question about the

5       plaintiff's entitlement to the thirty-month

6       stay.

7                    And if it ultimately turns out

8       that Apotex is not amenable to service here in

9       Delaware, they will have fooled us.  There are

10      no two ways about it.  They conceded that

11      jurisdiction was proper within a year of the

12      time we filed this suit in one of those eight

13      cases.

14                   And if the Court is to find that

15      there is no jurisdiction, it's imperative for

16      the preservation of the plaintiff's rights that

17      the case be transferred to some appropriate

18      forum, which, frankly, will be transferring it

19      from the hopper of Delaware cases that you have

20      to the hopper of Florida cases that you also

21      have as the appropriate procedural technique.

22      Because otherwise, we run the risk of there

23      being an accusation that the thirty-month stay

24      has been lost because the suit that was filed

```
 1    within the forty-five day period was dismissed
 2    rather than transferred.
 3                THE COURT:   Unless I just
 4    outright dismiss it, it's going to end up back
 5    in front of me, at least for pretrial purposes,
 6    one way or another.
 7                MR. LIPSEY:   Correct, but it's
 8    imperative for our purposes for preservation of
 9    the stay that if the Court finds no
10    jurisdiction, it would transfer rather than a
11    dismissal.  It's not horribly important for
12    Aurobindo.  We anticipated there might be a
13    challenge.  There was a protective suit there,
14    but procedurally, it would probably be best in
15    either instance to transfer the case to the
16    appropriate forum rather than dismiss it so as
17    to avoid any question about entitlement to the
18    stay.
19                So, what do we have with Apotex?
20    Why were we fooled?  We were fooled because
21    Apotex has been regularly, systematically, and
22    significantly engaged in this district over the
23    last five years in the conduct of its ANDA
24    business.
```

1              And why do I say that?  I say that

2       because AstraZeneca has people in white lab

3       coats out on Concord Pike doing research and

4       development.  They look for new drug products,

5       they test them, that's how we get access to new

6       markets.

7              The corresponding business

8       function for these gentlemen is done in this

9       courtroom, and these gentlemen ought just as

10      well to have white lab coats because they are in

11      here doing the research and development for the

12      generic drug company.  This is how they gain

13      access to new products:  By filing ANDAs, by

14      filing the paragraph four certification.  Why?

15      Because the first paragraph four certifier has

16      tremendous economic rewards for success, and

17      they are all interested in that.

18              And then participating in the

19      inevitable litigation over the patent with the

20      hope of winning a sufficient number of them to

21      economically justify the enterprise.  That, Your

22      Honor -- we now have enough experience with this

23      type of market and this type of business to know

24      that is a regular and ordinary business

61

```
 1    activity.  That is not the sort of thing that we

 2    see in normal corporate practice where a

 3    corporation gets sued because one of its

 4    employees struck somebody with a car, or

 5    somebody got injured while on their premises.

 6    It's not an unintended consequence.  It is their

 7    business.

 8              We contend that Apotex has been

 9    regularly engaged in that, and that satisfies

10    the long-arm statute here in Delaware.  A

11    regular pattern of business activity conducted

12    here.

13              THE COURT:  Do you have any cases

14    where Courts have accepted that?

15              MR. LIPSEY:  I do not because as

16    far as I know, nobody has made the argument.  I

17    will concede that it is a point of first

18    impression.  It does not appear to have been

19    addressed in the Abbott Myelin case they have

20    cited.  The Court there treated the litigation

21    just like regular, ordinary litigation.

22              It is for this Court to decide in

23    the first instance whether this is, in fact, the

24    case, given the special nature of this business,
```

```
1        the special nature of this litigation, the

2        importance of this type of activity to their

3        overall business.  That it is, in fact, a

4        regular business activity.

5                        And we feel that that alone gets

6        us over the hump here.  And, indeed, not

7        surprisingly, as I mentioned before in the

8        Allergan case, they actually admitted they were

9        amenable to personal jurisdiction here in a case

10       that was identical to this, a 271(e) ANDA case.

11       And there was no case-specific fact that was

12       involved there that made that jurisdiction

13       different.

14                       What do we have here?  We have the

15       Delaware long-arm statute, which has been

16       construed to extend to the limits of due

17       process.  We have a basket of context which is

18       candidly different in every case.  So the

19       question is, looking at our basket of context

20       here, does it offend the notion of due process

21       for this Court to exercise jurisdiction?

22                       And we contend it does not.

23       First, there is the pervasive litigation

24       context.
```

```
 1              Second, in every single one of
 2      those cases there were contracts entered into
 3      with Delaware counsel, and I submit the Court
 4      can take notice of the fact, probably
 5      substantial fees paid in connection with those.
 6              Thirdly, we have a situation where
 7      Apotex, Inc. and Apotex Corp. are parts of a
 8      unified entity that are working together for the
 9      purpose of selling Apotex, Inc.'s drug products
10      here in the United States.  They have repeatedly
11      admitted in the pleadings in those cases that
12      Apotex, Inc. makes numerous drug products
13      intended for sale in the United States,
14      including in Delaware.
15              We know that in the last five
16      years -- I will use general numbers rather than
17      specifics -- they've sold millions and millions
18      and millions of dollars of drug product in the
19      United States, including in Delaware, and we
20      know that the percentage of those sales that
21      have ended up in Delaware is roughly equivalent
22      to the percentage that the population of
23      Delaware bears to the rest of the nation.
24              So they are as generally present
```

1    here as they could be in any other state.  They

2    are doing exactly here what they are doing in

3    every other state.  And if this Court were to

4    say, "Well, the fact that there are fewer people

5    in Delaware and the absolute dollar number is

6    low," bars the courthouse door.  It bars the

7    courthouse door to Delaware citizens where the

8    courthouse door is not barred to citizens of

9    larger states.

10              We have the ninety different

11   products, 240 pharmacies, and thirty cities here

12   in Delaware in the last five years, and sales

13   roughly proportional to the population.  It's

14   not surprising that they conceded personal

15   jurisdiction in that Allergan case.  It's not

16   surprising that we relied on it.  It would be

17   surprising if they are not deemed generally

18   present here.  And for that reason, we would ask

19   the Court to transfer the case if it believes

20   that it was.

21              There was an argument made in

22   their reply brief -- Apotex Corp., which is the

23   one who did all the selling.  They're not really

24   our agent because we didn't really control them.

```
 1          I think Judge McElvey in the Wesley Jensen case

 2     dealt with that situation.  He pointed out that

 3     when we speak of agency under the Delaware long

 4     arm, it's not agency in that strict sense of

 5     absolute control.  It's really looking to

 6     whether these are two related entities that are

 7     engaged in a common scheme to a uniform end of

 8     selling a product here in the United States.

 9               In Delaware, there are lots of

10     cases that talk about when sales programs are

11     focused nationally and not excluding Delaware.

12     They are focused on Delaware.  And we believe

13     that that entire constellation of contacts here

14     is one that does not offend fundamental notions

15     of justice and substantial justice of fair play,

16     and that it's appropriate to exercise

17     jurisdiction over Apotex, Inc.

18               I guess one point I would make,

19     and I know you're desperate for me to sit down,

20     and I will.  It's getting to be lunchtime.  I

21     understand.

22               The urgency for resolving this

23     question has been ameliorated by the action of

24     the multidistrict panel.  In other words, we're
```

```
1     all going to be here for discovery no matter

2     what the decision is on this.  There may come a

3     time later in the case when they realize it may

4     be in their best interest, particularly if the

5     Delaware corporations are here for trial, that

6     it may not make any sense for them to continue

7     to pursue this.  And I would simply suggest to

8     the Court that there may not be any need to

9     immediately resolve this issue.

10                    THE COURT:    Thank you.

11                    Mr. Breisblatt?

12                    MR. BREISBLATT:  Yes, Your Honor.

13                    Mr. Lipsey's argument concedes

14     pretty much what we've argued, that there is no

15     tie between Apotex, Inc. and this jurisdiction.

16     He is reduced to arguing the percentages of the

17     population, which is never what the Courts in

18     this jurisdiction do.  They look at the absolute

19     numbers.  Less than one percent of Apotex

20     Corp.'s sales, even if you try to make an agency

21     argument, are made in Delaware.  Less than one

22     percent.

23                    In terms of the fact that they

24     made the error and sued Apotex here, even though
```

1    they had a letter from Apotex, Inc. saying that

2    -- and this was a paragraph four letter that I

3    believe was attached to one of the exhibits

4    dated November 5th, 2007 -- saying that, "The

5    servicing process of courtesy copies, the

6    following person is authorized to accept service

7    of process on behalf of Apotex:  Dabney

8    McEntire, Apotex Corp., Westin, Florida."

9              They made the decision, we believe

10   the wrong decision, to sue Apotex, Inc. here in

11   Delaware, and the only proper thing to do is,

12   because there is no personal jurisdiction over

13   Apotex, Inc., dismiss it.  Let them go down to

14   Florida.  Let them file it where they should

15   have to begin with, in the Southern District of

16   Florida.  It'll be back here on the MDL for

17   purposes of discovery, and then, as Apotex, Inc.

18   has done in every case, it can make its own

19   decision as to whether, for purposes of this

20   particular lawsuit, it wants to remain under the

21   personal jurisdiction of this Court.

22              THE COURT:  What about the

23   thirty-month stay issue Mr. Lipsey referred to?

24   If I took you up on what you're suggesting, are

68

```
 1    you going to have an argument that they lost the

 2    benefit of that stay?

 3                   MR. BREISBLATT:  What will happen

 4    is if that case is dismissed, it's our belief

 5    the FDA should not then hold the thirty-month

 6    stay against Apotex.  There might be other

 7    reasons for why we don't get tentative approval

 8    within whatever period of time, but it'll

 9    proceed.  And then if, in fact, Apotex gets

10    approval, they are in a position, if the case is

11    back here, which it will be, on the MDL, to seek

12    some kind of injunctive relief, which is what

13    everyone else does if there isn't a built-in

14    thirty-month stay.

15                   But the risk of the thirty-month

16    stay was not Apotex's doing.  We did not tell

17    AstraZeneca, "Don't sue us where we told you to

18    sue us.  Don't sue us where we told you our

19    agent is."

20                   THE COURT:  What about the last

21    thing that Mr. Lipsey said, that maybe this is

22    an issue of insufficient urgency to rule on at

23    this point?

24                   MR. BREISBLATT:  I would say it's
```

1    of very sufficient urgency.  If this Court, in

2    fact, finds as we believe it should, that there

3    is no personal jurisdiction over Apotex, Inc.,

4    you should dismiss them immediately, which will

5    give AstraZeneca time to run down to the

6    Southern District of Florida, file their lawsuit

7    where they should have filed it to begin with.

8    It'll be -- based on the MDL order, it will be

9    treated as a tag-along, and it will be up here

10   expeditiously, and we will continue with

11   discovery up here.

12            What we don't want is a situation

13   where, let's say, the Court waits six months,

14   decides that in fact we're right, dismisses the

15   lawsuit, and then we're already behind in term

16   of discovery.  I think the appropriate --

17            THE COURT:  I don't understand

18   that.  On that, you would have been engaged in

19   the discovery for six months.

20            MR. BREISBLATT:  Well, I misstated

21   that.  You're right.  We will continue doing

22   what we're doing, but we would like to get it

23   resolved sooner rather than later.  In other

24   words, we're not going to all of a sudden say,

1    "We're not cooperating in discovery up here

2    because we have a pending motion to dismiss."

3              We will continue.  But do I think

4    it should be handled expeditiously?  Yes.  I

5    would not put it off because I think it's an

6    important issue.

7              THE COURT:  Thank you.  Let's

8    move to the final defendant's personal

9    jurisdiction argument.

10             MR. WARD:  Thank you, Judge.

11   Jeff Ward for Aurobindo and I'm going to talk

12   about Aurobindo USA and Aurobindo India.

13             One of the things that Mr. Lipsey

14   said when he was up here before is that

15   plaintiff suspected that there was no

16   jurisdiction over Aurobindo India, so they filed

17   a protective suit in New Jersey.  We've had

18   discovery, and their suspicions are correct.

19   There is no personal jurisdiction here over

20   Aurobindo India in this case.

21             When you look at the context, that

22   becomes very clear.  There's only one argument

23   for jurisdiction, general jurisdiction under

24   3104(c)(4) which requires substantial context.

1        As Mr. Lipsey said, if we start to look in the

2        basket of context for each of these companies,

3        they're not sufficient, either Aurobindo India

4        alone or combined, if you choose to combine it

5        with Aurobindo USA

6                    If you start with Aurobindo India,

7        they haven't disputed that Aurobindo India is an

8        Indian company.  It has no business operations

9        at all in Delaware.  It doesn't make anything

10       here.  It's not registered to do business here.

11       It doesn't sell or solicit any business in

12       Delaware.

13                    The only thing that Aurobindo

14       India has allegedly done in Delaware is a couple

15       of things.  One is they've been sued here twice,

16       and that's the unilateral act of somebody else

17       that can't form a basis for jurisdiction.

18                    Mr. Lipsey argued previously that

19       they're in the ANDA business.  We're doing

20       business.  We expect to be sued.  Aurobindo, as

21       we said in our briefs, has filed over 120 ANDAs.

22       They've been sued four times.  I don't think we

23       expect to be hauled into court in every one of

24       these ANDA filings we make.  That is not

1      sufficient.  It's not sufficient at all.

2                    The other thing is that Aurobindo

3      India has formed some Delaware corporations;

4      two.  And I think the case law is very clear

5      that that level of corporate activity in

6      Delaware is not sufficient to support personal

7      jurisdiction over Aurobindo India.

8                    The case cited, the Alltech case,

9      is a very different case where the vast majority

10     of eighty-two companies' subsidiaries were

11     incorporated in Delaware.  It's night and day

12     from our particular situation.

13                    If you look at Aurobindo USA  --

14     the next thing is, let's take Aurobindo USA.

15     Let's look at their context.  We have a couple

16     of arguments.  First, there's an alter-ego

17     argument that is made.  They don't have any

18     case.  They didn't cite any case where the

19     alter-ego argument succeeded.  The cases they

20     cited rejected the alter-ego argument on

21     contacts that were much more sufficient and much

22     more close than the case we have here between

23     Aurobindo India and Aurobindo USA.

24                    The other argument is the agency

1    theory, and to cut to the chase, Your Honor, if

2    we assume there is an agency theory -- and I

3    think we have good case law that says that there

4    isn't -- but if there is, we have to look at the

5    specific contact of the agent and see how

6    sufficient that contact is.  What we have here

7    with Aurobindo USA, again, it doesn't own any

8    property in Delaware.  It doesn't, itself, do

9    any business in Delaware.

10            What it does is it sells products

11    to national wholesalers, retailers, purchasing

12    organizations, and others.  Some of those may

13    come into Delaware.  In the course of discovery,

14    plaintiff showed a mere $215 worth of Aurobindo

15    USA product coming into the State of Delaware.

16            It's their burden to show

17    jurisdiction, Your Honor.  They could have gone,

18    taken depositions, gotten documents, gone to

19    these wholesalers, retailers,  GPOs, found out

20    what was going on.  They didn't do it.  I think

21    as we said in our brief, their failure to do

22    that dooms them here.

23            What we've got at the end of the

24    day, we've got Aurobindo India, who's been sued

```
 1       here a couple of times, formed a couple of

 2       corporations.  We've got Aurobindo USA, and all

 3       they've done is sell product that may get here

 4       in some unknown amount. The only known amount is

 5       $200.

 6                    If you look at those baskets of

 7       context,  if you look into the basket as

 8       Mr. Lipsey said, it's empty, Judge.  There's

 9       just not enough there for jurisdiction.

10                    If you have any questions, I'm

11       happy to answer them.

12                    THE COURT:   No, I don't.

13                    Mr. Lipsey, no need to repeat

14       general arguments.

15                    MR. LIPSEY:  Our argument on

16       Aurobindo is very much like the argument on

17       Apotex.  They, too, are here conducting their

18       ANDA litigation business, which we contend, and

19       which we ask the Court to think carefully about

20       in this context.

21                    THE COURT:   Well, I guess they're

22       the ones who have only been sued four times.

23                    MR. LIPSEY:  Those are, as far as

24       we know, the only four paragraph four
```

1    certifications they made.  There's another

2    certification you can make if you're going to

3    wait for the patent to expire, and they can have

4    any number of those.  But when you file a

5    paragraph four certification, I think common

6    sense tells you you expect to be sued, and

7    indeed, they have been sued, and indeed, they

8    have voluntarily appeared here to conduct that

9    business here in Delaware.

10                One point I would make is the due

11    process clause is intended to protect parties

12    from undue intrusions of foreign governmental

13    power.  It is not intended to give parties a

14    right to pick and choose who the judge is when

15    the case is assigned.

16                And when you have a party who

17    comes in and waives jurisdiction repeatedly, and

18    all of a sudden when a particular judge shows up

19    and the jurisdictional challenge is made, that's

20    not what this due process right we're talking

21    about is intended to protect.  And that creates

22    an appearance of impropriety.

23                That's one reason why we feel that

24    these selective waivers of jurisdiction in this

1    Court are inappropriate and really manifest a

2    regular doing-of-business here.

3                    Aurobindo India, Aurobindo USA,

4    again, much the same relation as Apotex.

5    They're two related companies.  Both were

6    common, and both trying to sell their drugs.

7                    We got stiffed a little bit in

8    discovery here in that Aurobindo claims not to

9    track where its products go.  Apotex does track

10   where its products go.  Both Apotex and

11   Aurobindo sell to these national retailers like

12   Walgreens, Wal-Mart, and Rite Aid, which are

13   pervasive here in Delaware.  There's no reason

14   to expect that the percentage of Aurobindo

15   products showing up in Delaware is any different

16   than the percentage of Aurobindo products

17   showing up from Apotex.  If it became important

18   to prove up exactly what those numbers are, we

19   would obviously need more time to chase down all

20   these distributors.

21                    Frankly, they are operating in an

22   atmosphere of cultivated ignorance as to where

23   their products go.  We do have evidence of a

24   record from a similarly situated business entity

1    from which inferences can be drawn.

2                   We do have the argument for a lack

3    of true separateness here.  This is a very, at

4    least in our experience, unusual sort of

5    situation in that there are not even any

6    agreements between these two companies over

7    delivery of product or sale of product.  No

8    requirements contract.  No nothing.

9                   In fact, many of the invoices from

10   Aurobindo India to Aurobindo USA have a zero for

11   the transfer price, and the transfer price is

12   set later after they can see what they can get

13   for the product.

14                  We showed in our brief how there's

15   an overlapping pattern of directors and officers

16   from the two companies.  Many of them are

17   relatives with each other.  We've shown that

18   there is massive infusion of capital into

19   Aurobindo USA from Aurobindo India, and, in

20   fact, greater investment from India than there

21   is revenue from sales in the United States, at

22   least in 2007.

23                  And these are indicative of a lack

24   of separateness.  I think we also submitted some

 1     press releases where one of the U.S.A. officers

 2     referred to themselves as the U.S. arm of

 3     Aurobindo, and there's kind of a general

 4     observation only in the most formalistic of

 5     senses of the notion of coporate separateness.

 6     And the fact of the matter:  Two entities

 7     essentially working as one to sell these drug

 8     products throughout the United States and in

 9     Delaware.

10                 We also made an argument on Rule

11     4(k).  We run into this problem a lot, as you

12     can imagine.  We are always a little troubled by

13     these companies that preserve the illusion of

14     lack of involvement in the United States and

15     then claim to be able to pick and choose the

16     jurisdiction in which they can be sued simply by

17     saying, "Well, I consent here."  If there are

18     not contacts enough in Delaware, as we

19     demonstrated, there really aren't contacts

20     enough anywhere, and they ought to be amenable

21     to suit under Rule 4(k)(2).

22                 Thank you, Your Honor.

23                 MR. WARD:  May I respond?

24                 THE COURT:   Briefly, yes.

```
 1                    MR. WARD:  First off, Your Honor,
 2       I'm really not pleased to hear the words
 3       "appearance of impropriety" in our actions.  The
 4       fact there was another case where different
 5       counsel decided not to contest jurisdiction for
 6       the purposes of that case says nothing about
 7       what we're doing here.  We're disputing
 8       jurisdiction because we don't believe it's
 9       proper.
10                    The other thing is, now Mr. Lipsey
11       is trying to impute sales to Aurobindo without
12       any evidence.  What they needed to do was do the
13       discovery, and they didn't do it.
14                    And finally we come back to this
15       alter ego.  The companies are close.  They have
16       some issues, and they're close.  But there's a
17       lot of things they don't do.  There's a lot of
18       separateness, and we set that forth in our
19       brief.
20                    And there's also no evidence that
21       there's any fraud or inequity in the corporate
22       formation Aurobindo USA  They haven't shown it.
23       It's pure speculation  If you look at the Mobil
24       Oil case, like I said, much closer relationship
```

1    and no alter ego.  So I think that can easily be

2    rejected.  It's just not there.

3                    Finally, with the 4(k), as we said

4    in our brief, Aurobindo India ships product into

5    the port of New Jersey.  It has a branch office

6    in New Jersey.  As mentioned by plaintiffs in

7    their brief, it bought the facility for

8    Aurobindo USA in New Jersey, and it has

9    consented to jurisdiction in New Jersey.  We

10   have a case there, so --

11                   THE COURT:  That's where you

12   brought your case?

13                   MR. WARD:  We were sued there.  We

14   didn't bring a case.  We were sued twice, and we

15   answered, and that's it.

16                   THE COURT:  On the paragraph

17   four, is Mr. Lipsey right that you only had four

18   paragraph four ANDA filings?

19                   MR. WARD:  That may be correct,

20   Your Honor, but the fact that we only had four

21   of those, it also shows you that we routinely

22   file other types of filing than paragraph four,

23   so you can't say that our business is still

24   litigated in the paragraph four cases.

```
 1                    THE COURT:   Thank you very much.

 2       Is there something further?

 3                    MR. LIPSEY:  One point in closing.

 4       Unlike many of the cases that cited in the

 5       brief, we do have here a Delaware plaintiff.

 6       Unlike many of the cases in the brief, this

 7       Court does have an interest in providing a forum

 8       for the resolution of those disputes.

 9                    I would leave the Court with the

10       notion that the most critical thing in all of

11       this, given that we're all here for discovery

12       anyway, is that these cases not be dismissed so

13       as not to raise any question of entitlement to

14       the thirty-month stay, but it's got to be

15       transferred to the appropriate court.

16                    Thank you, Your Honor.

17                    THE COURT:   Thank you.  I believe

18       that covers all the motions that I have in front

19       of me; is that correct?

20                    I thank you all for a very

21       informative and relatively streamlined argument.

22       Very interesting issues, and we'll take them

23       under advisement.

24                    Thank you all, and have a good
```

1     holiday weekend.

2               (Proceeding ended at 11:25 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1              C E R T I F I C A T I O N

2              I, DEANNA WARNER, Professional

3  Reporter, certify that the foregoing is a true and

4  accurate transcript of the foregoing proceeding.

5              I further certify that I am neither

6  attorney nor counsel for, nor related to nor employed

7  by any of the parties to the action in which this

8  proceeding was taken; further, that I am not a

9  relative or employee of any attorney or counsel

10  employed in this case, nor am I financially

11  interested in this action.

12

13

14

15              _____

16              DEANNA WARNER

17              Professional Reporter and Notary Public

18

19

20

21

22

23

24