IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HONEYWELL INTERNATIONAL INC.  :
and HONEYWELL INTELLECTUAL    :
PROPERTIES INC.,              :
                              :
        Plaintiffs,            :
                              :
    v.                        :  C.A. No. 04-1337-JJF
                              :  CONSOLIDATED
                              :
NIKON CORPORATION, et al.,    :
                              :
        Defendants.           :

---

Martin R. Lueck, Esquire; Matthew L. Woods, Esquire; Stacie E.
Oberts, Esquire; Peter N. Surdo, Esquire; Daniel M. White,
Esquire and Lauren E. Wood, Esquire of ROBINS, KAPLAN, MILLER &
CIRESI L.L.P., Minneapolis, Minnesota.
Thomas C. Grimm, Esquire and Benjamin J. Schladweiler, Esquire of
MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware.

Attorneys for Plaintiff.

Lawrence Rosenthal, Esquire and Matthew W. Siegal, Esquire of
STROOCK & STROOCK & LAVAN LLP, New York, New York.
Philip A. Rovner, Esquire of POTTER ANDERSON & CORROON LLP,
Wilmington, Delaware.

Attorneys for Defendants, FUJIFILM Corporation and FUJIFILM
U.S.A. Inc.

Stephen S. Korniczky; Elizabeth L. Brann, Esquire and Martin R.
Bader, Esquire of PAUL HASTINGS JANOFSKY & WALKER LLP, San Diego,
California.
Richard L. Horwitz, Esquire and David E. Moore, Esquire of POTTER
ANDERSON & CORROON LLP, Wilmington, Delaware.

Attorneys for Defendants, Samsung SDI Co., Ltd. and Samsung SDI
America, Inc.

---

**MEMORANDUM OPINION**

December 4, 2009
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is a Motion For Summary Judgment Of Invalidity Based On The On Sale Bar (D.I. 771) filed by Defendants Samsung SDI Co., Ltd., Samsung SDI America, Fujifilm Corporation and Fujifilm U.S.A. Inc. (collectively, the "Manufacturer Defendants"). For the reasons discussed, the Court has granted the Motion.[1]

## I.   BACKGROUND

This is an action for patent infringement brought by Honeywell International Inc. and Honeywell Intellectual Properties Inc. (collectively, "Honeywell") against the Manufacturer Defendants and others for infringement of claim 3 of U.S. Patent No. 5,280,371 (the "'317 patent"), which relates generally to a directional diffuser for a flat panel liquid crystal display ("LCD") of the type used, for example, in aircraft cockpit displays. The procedural history of this action is protracted and complex and has been set forth fully by the Special Master in previous Reports and Recommendations issued in this case.

By way of brief summary, this action has been divided into two tracks, with the Customer Defendants being stayed, and the Manufacturer Defendants proceeding toward trial. Upon receiving

---

[1] Defendants' Motion also seeks summary judgment on the failure to disclose the inventors' best mode. The Court has not reached this question and given the deferral of further proceedings in this case, the Court will not issue a decision on the best mode issue.

the Court's Order (D.I. 905) granting the instant Motion For Summary Judgment, trial was temporarily adjourned while the parties determined whether they wished to proceed on the remaining issues. Because the parties could not reach agreement on the propriety of continuing trial, the Court cancelled trial on the outstanding issues. (D.I. 951.)

## II.   STANDARD OF REVIEW

In pertinent part, Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 200 (3d Cir. 1995).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. . . . In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal citations omitted). However, the mere existence of some evidence in support of the non-movant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. Id.

### III. DISCUSSION

A. Applicable Legal Principles

In pertinent part, 35 U.S.C. § 102(b) states that "[a] person shall be entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b) (2002). To prevail on the on-sale bar defense, an accused infringer must establish by clear and convincing evidence that before the critical date[2] (1) the product was the subject of a commercial offer for sale, and (2) that the invention was ready for patenting. See Pfaff v. Wells Elecs., 525 U.S. 55, 67 (1998). Under the first prong of Pfaff, courts should determine whether there has been a commercial offer for

---

[2] The "critical date" is one year prior to the filing date of the patent application.

3

sale by "applying traditional contract law principles." <u>Allen Eng'g Corp. v. Bartell Indus., Inc.</u>, 299 F.3d 1336, 1352 (Fed. Cir. 2002). The second prong of <u>Pfaff</u> "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." <u>Pfaff</u>, 525 U.S. at 67-68.

B. <u>The Parties' Contentions</u>

The Manufacturer Defendants contend that Honeywell sold an embodiment of the invention claimed in claim 3 of the '371 patent more than one year before the July 9, 1992 filing date of the '371 patent, and therefore, the '371 patent is invalid pursuant to the on-sale bar of Section 102(b). Specifically, the Manufacturer Defendants contend that in January 1990, Honeywell set out to fabricate display units which incorporated the crossed lens array embodiment of a directional diffuser so that these units could be demonstrated to Boeing. In June 1990, Honeywell then submitted to Boeing the AIMS Proposal, a four-volume sales proposal which included, among other things, a 313 page volume devoted to "Technical Proposal & Plans" (Volume III) and a 125 page volume entitled "Price Offering & Contractual Terms & Conditions" (Volume IV). The Manufacturer Defendants contend

4

that the AIMS Proposal satisfies the commercial offer for sale requirement of the on-sale bar, and that the subject matter of the AIMS Proposal embodied claim 3 of the '371 patent.

In response, Honeywell contends that the June 1990 AIMS proposal was not an offer for sale, because it did not create a power of acceptance in Boeing. Specifically, Honeywell contends that the AIMS system was not identified specifically in the AIMS Proposal, and that in light of the business relationship between the parties, numerous meetings over many months would have been required to determine the exact requirements of the AIMS project and the AIMS system. According to Honeywell, the AIMS Proposal is only a confirmation of Honeywell's capabilities. Thus, Honeywell contends that the AIMS Proposal could not generate a "simple acceptance" by Boeing, and therefore, the AIMS Proposal cannot constitute a definite commercial offer for sale.

In addition, Honeywell contends that the invention of claim 3 of the '371 patent was not the subject of the AIMS Proposal. Honeywell's argument in this regard is related to its argument that the AIMS Proposal did not contain sufficient technical detail to constitute a commercial offer for sale. Specifically, Honeywell contends that because the AIMS system had not yet been defined, it could not have embodied the invention of claim 3. Alternatively, Honeywell contends that the AIMS Proposal only discloses a one-lens array embodiment, and therefore, it does not

satisfy the two lens array limitation of claim 3.

    C.    <u>Whether The June 1990 AIMS Proposal Satisfies The Requirements of Section 102(b) So As To Invoke The On Sale Bar</u>

The determination of whether a product was the subject of a commercial offer for sale so as to invoke the on-sale bar involves two steps. First, the Court must determine whether there was a "commercial offer." Second, the Court must determine whether that offer was an offer of the patented invention. <u>Scaltech, Inc. v. Retec/Tetra, LLC</u>, 269 F.3d 1321, 1330 (Fed. Cir. 2001).

        1.    Whether The AIMS Proposal Constitutes A "Commercial Offer" In The Contract Sense

The contours of a commercial offer are defined by reference to federal common contract law. <u>Group One, Ltd. v. Hallmark Cards, Inc.</u>, 254 F.3d 1041, 1046 (Fed. Cir. 2001) (holding that "the offer must meet the level of an offer for sale in the contract sense, one that would be understood as such in the commercial community"). In determining whether a communication rises to the level of a commercial offer for sale, courts look to the Uniform Commercial Code ("UCC") and the Restatement of Contracts. "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under 102(b)."

6

Group One, 254 F.3d at 1048. By way of further instruction, the Restatement (Second) of Contracts defines an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24. The Federal Circuit has instructed courts to look to the language used by the parties to determine whether an offer was intended:

> In any given circumstance, who is the offeror, and what constitutes a definite offer, requires closely looking at the language of the proposal itself. Language suggesting a legal offer, such as "I offer" or "I promise" can be contrasted with language suggesting more preliminary negotiations, such as "I quote" or "are you interested." Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling.

Group One, 254 F.3d at 1048. In addition to the language used by the parties, it is also appropriate to consider the circumstances surrounding the making of the offer, including the context of any prior communications or course of dealing between the parties; whether the communication was private or made to the general public; whether the communication comes in reply to a specific request for an offer; and whether the communication contains detailed terms. See, e.g., Fisher-Price, Inc. v. Safety 1st, Inc., 109 Fed. Appx. 387, 392 (Fed. Cir. 2004) (citing 1 Corbin on Contracts § 2.2 at pp. 1-2 (Joseph M. Perillo, Rev. ed. 1993) and Restatement (Second) of Contracts § 26, cmt. c (1981)).

7

Actual acceptance of the offer is not required to implicate the on-sale bar. See Scaltech, 269 F.3d at 1328. That the offer, even if accepted, might not have ultimately led to an actual sale of the invention is also not relevant. Id. at 1329.

In this case, the evidence establishes that Honeywell submitted the AIMS Proposal in response to Boeing's June 1990 Request For Proposal. The AIMS Proposal is several hundred pages in length and includes four volumes divided into discrete topics including "Technical Proposal & Plans," "Price Offering & Contractual Terms & Conditions," and "Bidder's Offer." The "Bidder's Offer" provides, among other things:

    1.   This is a firm fixed price proposal.

    2.   The prices are valid for 120 days from 15 June 1990 based upon shipment FOB, Phoenix, AZ.

    3.   The recurring price quotation is expressed in 1990 dollars and subject to abnormal escalation production. The non-recurring price quotation is then year dollars.

    4.   This quotation is based upon Boeing RFP #6-5217-48-009, dated 11 May 1990 and S.O.W. Z243Z001-1, dated 11 May 1990.

    5.   The billing schedule for non-recurring is contained in Figure 2-3.

    6.   All deliverable non-production hardware and red label units are included at production prices.

>    7.  Honeywell agrees to defer invoicing for all deliverable hardware until delivery of the first airplane to Boeing's customer or July 1995, whichever occurs first.
>
>    8.  The ELF recurring quote assumes both the internal and external hardware will be supplied by Honeywell.
>
>    9.  The non-recurring estimate includes on-site engineering in Seattle from August 1990 to August 1991 for SCD development and system integration. In addition, our estimate assumes on-site engineering support from August 1991 through certification.
>
>    10. The non-recurring estimate include FMCS performance data base development effort for three engine families, with an initial certification and a significant update (performance data optimization) for each family following the initial certification.

(Defendants' Exh. S at BOEING 002671-72.)[3] That Honeywell intended the AIMS Proposal to constitute a formal offer is evident not only in the above terms which express firm and definite commitments regarding, among other things, price and delivery, but also in the Statement Of Management Commitment attached to the AIMS Proposal in which Honeywell confirms its "firm and total commitment to a successful, on-schedule AIMS Program . . ." (Defendants' Exh. S at BOEING 002666.)

---

[3] The Court refers to the exhibits submitted by the Manufacturer Defendants as "Defendants' Exh(s)." and these exhibits are found at the three volume set at D.I. 773, 774 and 775, as well as at D.I. 830. Honeywell's exhibits are referred to as "Honeywell Exh(s)." and are found at D.I. 796, 797, and 798.

9

Honeywell contends that this detailed proposal was not an offer, based on the "longstanding business relationship between Honeywell and Boeing, as well as the industry custom and norm in the context of the proposal phase of a complex, developmental project like AIMS, [which] dictated that the parties would need to meet over the course of many months to determine the exact requirements of the AIMS project and the AIMS system. Thus, Boeing never 'accepted' responses like Honeywell's because Boeing *could not*, do so; the AIMS system had not yet been defined." (D.I. 789 at 13 (emphasis in original).)

As the Court has noted, however, acceptance is not required for a proposal to be considered a commercial offer of sale. Rather, the focus of the inquiry is whether the offer could have been made into a binding contract by formal acceptance. In this case, Honeywell relies on the parties' business relationship and the alleged custom and practice in the industry to argue that the AIMS Proposal could not be a formal offer for sale because further negotiation between the parties was expected. In the Court's view, however, the fact that further negotiations might arise, or even be expected, does not preclude the AIMS Proposal from being an invalidating offer where, as here, the AIMS Proposal contained the essential terms of an offer and Honeywell manifested its intent to make an offer to Boeing. Indeed, even Honeywell's 30(b)(6) witness acknowledged that, while

10

negotiations were to be expected, Boeing could have accepted the offer as it was made:

> Q:   Was it Honeywell's desire that Boeing agree to the terms that Honeywell set forth in its proposal?
>
>   * * *
>
> A.   I mean, would Honeywell like Boeing to take its first price proposal and the contract terms that are all in its favor, I mean, like academically, yeah.

(Defendants' Exh. BB at 34:6-12.)

Honeywell contends that the Manufacturer Defendants are improperly applying principles from RCA Corp. v. Data Gen. Corp., 887 F.2d 1056, 1062 (Fed. Cir. 1989) and its progeny, which the Supreme Court overruled in Pfaff. In pre-Pfaff cases, the Federal Circuit approached the on-sale bar from the point of view of a totality of the circumstances considered in light of the policies underlying Section 102(b). See, e.g., In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 71 F.3d 1573, 1577 (Fed. Cir. 1995). This totality of the circumstances approach to the on-sale bar informed the Federal Circuit's holding in RCA that commercial activity not rising to the level of a formal offer for sale could trigger the on-sale bar. RCA, 887 F.2d 1056, 1062-1063 (Fed. Cir. 1989) ("We agree with RCA that an on-sale bar cannot be determined by ascribing a label to certain activity so as to make it appear to be commercial, in lieu of considering whether the activity runs counter to the

11

policies of the on-sale bar that are to be effectuated."). Notably, the Supreme Court did not expressly mention RCA in Pfaff, but instead addressed the deficiencies of totality of the circumstances test in general and devised the two-part test outlined by the Court previously.

Applying Pfaff in Group One, the Federal Circuit recognized that the Supreme Court's articulation of the "commercial offer" requirement, in the context of established contract law, and the reversal of the totality of the circumstances test was meant "to bring greater certainty to the analysis of the on-sale bar." Group One, 254 F.3d at 1047. In keeping with this purpose, the Federal Circuit expressly overruled the dictum in RCA that was informed by the totality of the circumstances test and which suggested that something less than a formal offer for sale could still trigger the on-sale bar. Id. at 1046. What remained unchanged, however, and what was essentially reconfirmed in Group One, is the principle holding of RCA, that an offer to sell is an essential requirement of the on-sale bar and "'a definite offer in the contract sense clearly meets this requirement.'" Id. (quoting RCA, 887 F.2d at 1062).

In this case, we do not have the type of commercial activity referred to in the RCA dicta, but rather, we have a definite offer, capable of acceptance, in the contract sense, and such offers have always been sufficient to invoke the on-sale bar.

12

Accordingly, the Court's holding here is not based on a resurrection of overruled principles from <u>RCA</u>, but upon the actual language of the AIMS Proposal, which the Court concludes is sufficient, as a matter of law, to constitute a definite offer for sale in the commercial sense.

>   2.  Whether The AIMS Proposal Offered The Patented Invention

Having concluded that the AIMS Proposal was a commercial offer for sale, the Court must next determine whether the AIMS Proposal offered the patented invention. "[T]he invention that is the subject matter of the offer for sale must satisfy each claim limitation of the patent, though it may do so inherently." <u>Scaltech</u>, 269 F.3d at 1329. That the product offered for sale is, in fact, the claimed invention may be established by any relevant evidence, including memoranda, drawings correspondence and witness testimony. <u>RCA</u>, 887 F.2d at 1062.

Claim 3 of the '371 patent provides:

> A display apparatus comprising: a light source; a liquid crystal panel mounted adjacent to said light source for receiving light from said light source; and first and second lens arrays, each having a plurality of individual lenslets, disposed between said light source and said liquid crystal panel for providing a predetermined variation with viewing angle of light transmission from said light source through said lens arrays and said liquid crystal panel, wherein at least one of said first and second lens arrays is rotated about an axis perpendicular to said liquid crystal panel in order to provide a slight misalignment between said lenslets and said liquid crystal panel.

Honeywell concedes that the AIMS Proposal discloses a directional diffuser as required generally by claim 3 of the '371 patent, but Honeywell contends that this directional diffuser does not meet the precise limitations of claim 3, because it "only discloses a directional diffuser having one lens--and not the two lens arrays limitation of claim 3." (D.I. 789 at 18.) However, Volume III of the AIMS Proposal entitled "Technical Proposal and Plans" expressly discloses "a directional diffuser with both a horizontal and vertical component." (Defendants' Exh. H.) Honeywell contends that the term component does not necessarily mean a second lens array and directs the Court to a diagram in the AIMS proposal which Honeywell contends depicts a single lens array.

In the Court's view, Honeywell's argument ignores the totality of the evidence presented. The evidence presented establishes that Honeywell constructed three prototypes for Boeing's consideration, DU#8, DU#9, and DU#10. Each of these were demonstrated to Boeing and fabricated with two lens arrays. (Defendants' Exh. L; Defendants' Exh. M; Defendants' Exh. N; Defendants' Exh. O; Defendants' Exh. P; Defendants' Exh. C at 301:3-303:16.) The technical individuals from Honeywell involved in the Boeing project all knew that what was under consideration to meet Boeing's needs was the double lens array, and Honeywell's argument to the contrary suggesting a single lens array is

untenable in light of this evidence. (Defendants' Exh. D at 99:9-24, 124:19-125:7; Defendants' Exh. C at 272:3-16; Defendants' Exh. I at 210-211; Defendants' Exh. H.)  In fact, the AIMS Proposal expressly offered DU#9 to Boeing and referred to it as deliverable by August 1990. (Defendants' Exh. H at HW016548.) Further, the testimonial and documentary evidence confirm that DU#8, #9, and #10 were all offered to Boeing for its consideration during the course of Honeywell's work with Boeing in conjunction with the AIMS Proposal (Defendants' Exh. D at 98:22-99:8; Defendants' Exh. C at 622:20-623:20; Defendants' Exh. I at 103:20-104:10; Defendants' Exh. H at HW016548), and that DU#10, with the crossed lens arrays, was tested by Boeing before December 18, 1990. (Defendants' Exh. R at HW016928-35; Honeywell Exh. S at HW17006.)

As for the depiction in the AIMS Proposal to which Honeywell directs the Court, the Court notes that the depiction is labeled "directional diffuser <u>assembly</u>." (Defendants' Exh. H at HW016391 (emphasis added).) As the Manufacturer Defendants point out, this diagram does not necessarily inform anyone as to how many lens arrays are contained in the assembly. However, it is clear from the evidence, as set forth by the Court above, that Honeywell knew that the double lens array was the assembly that provided the best results, that these double lens embodiments were offered to Boeing and tested by Boeing in the form of DU#8,

#9 and #10, and that these DUs had a "patent in process" which eventually became claim 3 of the '371 patent. (Honeywell Exh. S at HW017006, Defendants' Exh. R at HW01016928-35; Defendants' Exh. C. at 301:3-303:16; Defendants' Exhs. L-P; Defendants' Exh. J at HW014137; Defendants' Exh. D at 98-99) Accordingly, based on the evidence submitted by the parties, the Court concludes that the Manufacturer Defendants have established by clear and convincing evidence that the patented invention was the subject of a commercial offer of sale by Honeywell to Boeing.

### 3. Whether The Invention Was Ready For Patenting

Proof of reduction to practice before the critical date satisfies the on-sale bar requirement that the invention was ready for patenting. See, e.g., Plumtree Software v. Datamize, LLC, 473 F.3d 1152, 1161 (Fed. Cir. 2006). In this case, Honeywell claims that the invention was reduced to practice by May 1990, both prior to the critical date and prior to the submission of the AIMS Proposal to Boeing. (See, e.g., Defendants' Exh. K, Answer To Interrogatory No. 6 and First Supplemental Response to Samsung SDI's Interrogatory No. 6.) Accordingly, the Court concludes that this final requirement of the on-sale bar is satisfied by Honeywell's own admissions and supporting documentation regarding reduction to practice.[4]

---

[4] In the Court's view, the fact that Honeywell concedes reduction to practice before submission of the AIMS Proposal to

**IV. CONCLUSION**

For the reasons discussed, the Court has granted the Manufacturer Defendants' Motion For Summary Judgment Of Invalidity Based On The On Sale Bar.

An appropriate Order has been entered.

---

Boeing further supports the Court's conclusion that the invention of claim 3 was being offered to Boeing during the course of the parties' dealings in connection with the AIMS Proposal. Honeywell's reduction to practice admission means that an actual embodiment which included all elements of the claim was built and ready for patenting, and the supporting reduction to practice documents show that the work being done with regard to two lens arrays was being done to entice Boeing's business. (See, e.g., Defendants' Exhs. K, L, M, N, O, D at 134:4-23.)